THE STATE ex rel. DENTON DUNN v. J. M. COBURN, Treasurer of State Central Committee of the Progressive Party of Missouri.

In Banc, July 2, 1914.

1. **MANDAMUS: Waiver of Alternative Writ: Demurrer: Facts of Case.** Where the issuance of the alternative writ in mandamus is waived, and by agreement the petition is to be taken for such writ, the facts pleaded in the petition, upon the filing of a general demurrer thereto by respondent, become the facts of the case. .

260 Mo.—12

State ex rel. v. Coburn.

2. **POLITICAL PARTIES: Regulation By State: Primary.** The State, in the interest of good citizenship. and under the general welfare clause of the Constitution, can pass laws regulating political parties, and the manner of nominating candidates for office, and prescribe the terms upon which voters may be permitted to vote for candidates.

3. ————: ————: **Fraud: Fusion: Primary.** Fraud and deceit are often imbedded in and attend party fusions: fraud, because it is practiced upon the unsuspecting voter by a few political manipulators; deceit, because when a candidate of one political faith permits his name to be placed upon a ticket under a caption indicating a different political faith, deceit is tolerated and practiced. Such fraud and deceit is a hurt to the State, and the State in the exercise of its police power can strike at such evils by laws designed to regulate party nominations and the printing of the names of candidates on the ballots to be used at the general election.

4. **DECLARATION OF CANDIDACY: Primary: Sec. 5862, R. S. 1909: Constitutionality.** Section 5862, Revised Statutes 1909, providing that "no person shall file more than one written declaration indicating the party designation under which his name is to be printed on the official ballot," is not violative of the clause of the Constitution (Art. 2, sec. 9) declaring "that all elections shall be free and open; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." General primary elections to nominate party candidates were not in mind when this constitutional clause was framed, and the word "elections" therein has reference to choosing a person or persons for office by votes, and was not used in the sense of nominating candidates for office by a political party. [BROWN, J., dissenting.]

5. ————: **On More Than One Ticket: Sections 5862 and 5891 Read Together: Constitutional.** Section 5862, Revised Statutes 1909, denying to a candidate the right to have his name appear on the tickets of two or more parties at the primary, and section 5891, declaring that the name of no candidate shall be printed oftener than once on the ballots to be used at the general election, must be read together, for it would lead to confusion and folly to strike down section 5862 and permit section 5891 to stand. When the words of section 5891, namely, "underneath the name of each candidate [on the ballot to be used at the general election] shall be left a blank space sufficiently large to contain a written name," are considered, it cannot be said that an election is not "free and open" and that any voter can vote for any candidate for any office, whether nominated by his party or another.

State ex rel. v. Coburn.

6. ————: **Qualification of Voters.** The validity of section 5862, Revised Statutes 1909, denying to a candidate for office the right to declare himself a candidate of two or more parties, is not affected by section 9 of article 2 of the Constitution prescribing the qualification of a legal voter.

7. ————: **Power of Legislature.** The General Assembly has power to enact any reasonable regulation of elections not prohibited by the Constitution.

8. ————: **Equality of Opportunity: To Be Candidate of Two Parties: Primary Election Law.** It is not to deny a candidate for office equality of opportunity to deny him the right to be a candidate of two or more parties. That right is denied to all candidates alike, both at the primary and at the general election, and to allow it to one whom two or more parties wish to nominate in the primary, and deny it to all others, is to discriminate in his favor. Likewise to permit his name to be printed twice on the ballots used at the general election and all other candidates' names to be printed only once thereon, is to be unfair, and to permit a discrimination in his favor. It would be also to promote political fusion at the sacrifice of political principles. The statute strikes at the evils of fusion by in effect declaring that the voters are not to be deceived by a "false label" of a candidate.

    *Held,* by BROWN, J., dissenting, *first,* that a statute which is designed to prevent fusion or voluntary coalition of political parties tends to make possible the election of officers by a minority of voters, and is therefore contrary to the idea of "government by the consent of the governed;" *second,* the clause of the Constitution ordaining that "elections shall be free and open" means that every eligible person may aspire to office, and receive the same if the voters so direct, and the statutes which require a candidate to pay money to the treasurer of a political party for the privilege of having his name printed on the tickets to be used at the primary is not only violative of that constitutional guaranty, but a monstrous fraud upon candidates and the State itself; *third,* the provision of the primary law that permits judges of election to determine to what political party voters belong, and even to swear them to support the nominees of the party whose ticket he wishes to vote, in case his political allegiance is not known, is not only unconstitutional, but likewise monstrous; and, *fourth,* that voters will be deceived by the placing of a candidate's name on two or more tickets, when the members of those parties express their desire therefor at a primary, is untenable, and a dread of its fraudulent unfairness is imaginary, as shown by actual experience.

## Mandamus.

Writ denied.

*L. A. Laughlin* and *John F. Cell* for relator.

On the record in this case but a single question is presented for the decision of the court: Is the clause found in Sec. 5862, R. S. 1909, unconstitutional and void? If one of its provisions, i. e., that no candidate shall file more than one declaration of his intention to become a candidate at the primary, that no vote cast for a person who is a candidate for the same office on another ticket shall be counted, that no name shall appear in more than one group on the ballot used at the general election, is invalid, they are all invalid. If one of them is valid, they are all valid. People ex rel. v. Election Commissioners, 221 Ill. 9. That laws providing for compulsory primary elections must conform to the requirements of the Constitution imposed upon other elections by the people, see: Johnson v. Grand Forks Co., 16 N. D. 363, 125 Am. St. 662; Spier v. Baker, 120 Cal. 370, 41 L. R. A. 196; Leonard v. Commonwealth, 112 Pa. 607. In the absence of any statute one named as a candidate by different political parties is entitled to have his name appear upon the ballot, in the group headed by the name of each party. Williams v. Dalrymple, 132 Mo. 62; State ex inf. v. Bland, 144 Mo. 553. A political party is not a favorite of the law. It is a trust, or combination of candidates legalized by law for certain purposes, but it is not favored any more than any other trust or combination is favored. Shepard v. Superior Ct., 60 Wash. 370, 140 Am. St. 925; State v. Frear, 142 Wis. 320. In general, a legislative interference with the elective franchise must stand the test, at least, of these fundamentals of the Constitution: (a) The express and implied inhibitions of class legislation; (b) the recognized exist-

ence and inviolability of inherent rights; (c) the constitutionally declared purpose of government; and (d) the express guaranty of the right to vote. State ex rel. v. Phelps, 144 Wis. 1, 35 L. R. A. (N. S.) 353; Murphy v. Curry, 137 Cal. 479, 59 L. R. A. 97; Hopper v. Britt, 203 N. Y. 144, 37 L. R. A. (N. S.) 825; In re Callahan, 200 N. Y. 59, 140 Am. St. 626; Ladd v. Holmes, 40 Ore. 167. The denial of the right of a person to be a candidate for the nomination of as many political parties as see fit to nominate him is an unreasonable restriction upon the right of suffrage because it denies him the equality of opportunity which is an essential feature of the exercise of the right of suffrage; Hopper v. Britt, 203 N. Y. 144.

*George H. Imbrie* and *Guy C. Cooley* for respondent.

(1) Every presumption should be indulged in favor of the constitutionality of the law. In re Burris, 66 Mo. 442; State ex rel. v. Railroad, 92 Mo. 137; State v. Hope, 100 Mo. 347; Dell v. Mississippi Co., 107 Mo. 464; State v. Tower, 185 Mo. 79; State v. Webber, 214 Mo. 272; State ex rel. v. Williams, 232 Mo. 56. If the suggestion of relator is correct that the section of the general election law providing the form of the ballot is to be construed with the primary law prohibiting the filing of more than one declaration, then it is to be observed that the general election law complained of by relator does not keep him from being voted for in more than one column or group. This law keeps him from having his name printed in more than one column or group. Is this an unwarranted and unreasonable interference "with the free exercise of the right of suffrage?" First, the free exercise of the right of suffrage by the elector is not interfered with in the general primary. For if he belonged to one political party he cannot vote in the primary of another

political party, and the other proposition should prevail that he ought not to be permitted to vote in the primary of his own party for a candidate and member of another political party. If this restriction of confining the voter's choice for a candidate for a political office to members of his own party did not prevail, but was extended to persons from all political parties who might file indiscriminately with nothing on the primary ballot to indicate to what political party the particular candidate belonged, there would not only be complication and confusion, because of inability to determine the candidate's principles, but also the size of the ballot would be such as to cause complication and confusion. State ex rel. Runge v. Anderson, 100 Wis. 523. (2) Does this restriction, as suggested by counsel of relator, deny a candidate "the equality of opportunity which is an essential feature of the exercise of the right of suffrage?" In the primary election he can file one written declaration. No other candidate can file more. He can have his name printed on the official ballot at the general election once in one column or group. No other candidate can have more and he can be voted for in any other column or group by having his name written in. No other candidate can have more. To permit any candidate to have his name printed in more than one column or group would be an unfair advantage to such candidate. State ex rel. v. Bode, 34 L. R. A. 499, 55 Ohio St. 224; Todd v. Election Commissioners, 104 Mich. 474, 29 L. R. A. 336. Counsel for relator quote extensively from Hopper v. Britt, 203 N. Y. 144, 37 L. R. A. 825. This decision by the New York Court of Appeals, as has been before suggested, is contrary to the opinions of the Supreme Courts of a number of different States which have upheld similar statutes. States ex rel. v. Porter, 13 N. D. 406, 67 L. R. A. 473; Shepard v. Superior Ct., 60 Wash. 370, 140 Am. St. 925; People v. Czarnecki,

256 Ill. 320; State ex rel. v. Wells, 41 L. R. A. (N. S.) 1088.

GRAVES, J.—This is an original action of mandamus. The relator, Denton Dunn, shows by his petition that he has all the legal qualifications for judge of the Sixteenth Judicial Circuit, Division number Six, of the State of Missouri. He also avers that he is a member of the Republican party, and that he has taken the necessary steps to get his name upon the Republican ticket at the State primary in August next. After averring and showing the foregoing facts, his petition then further proceeds:

"That pursuant to a resolution passed by the county central committee of Jackson county, of the political party known as the Progressive party, your petitioner was asked to file a declaration of his intention to become a candidate for the nomination of the Progessive party, for the aforesaid office of circuit judge of Division number Six of Kansas City. Accordingly your petitioner on the 21st day of May, 1914, tendered and offered to pay to J. M. Coburn, treasurer of the State Central Committee of the Progressive party of Missouri, the sum of twenty-five dollars, good and lawful money of the United States, as required by law, and asked to take his receipt therefor; that said State treasurer, J. M. Coburn, refused to receive said money and to give your petitioner said receipt, and gave as his reason therefor that to accept said sum of money and to give a receipt therefor would be in violation of the provisions contained in the following section of the Revised Statutes of Missouri:

" 'Section 5862. No person shall file more than one written declaration indicating the party designation under which his name is to be printed on the official ballot.'

"Your petitioner avers that said section is unconstitutional and void and should be for naught held, for

the reason that it violates section 9 of article 2 and section 2 of article 8 of the Constitution of this State.

"Wherefore, your petitioner being without other adequate remedy, prays the issuance by the Honorable Supreme Court of Missouri, of an alternative writ of mandamus, directing said J. M. Coburn, as said treasurer of the State Central Committee of the said Progressive party, to receive the said sum of twenty-five dollars and to issue a receipt therefor or to show cause at some early day to be named by this court, why he has not done so, and your petitioner prays for such other and further relief to which, by reason of the premises, he may be entitled."

By agreement of counsel the issuance of our alternative writ was waived, and the petition taken as and for such alternative writ. Respondent has filed a general demurrer and stands thereon. In such case the facts pleaded in the petition become the facts of the case. The petition upon its face challenges the constitutionality of section 5862, Revised Statutes 1909, but it in fact goes deeper and attacks the validity of section 5891, Revised Statutes 1909, as amended in 1913 by the Laws of 1913, p. 327. The first section, supra, has application to State primary elections, whilst the latter goes to the election itself. Upon the record the questions are of law rather than of fact. Of such questions in their order, in the course of the opinion.

I. In the statement of the case we have said that the petition, whilst in terms it is leveled at Revised Statutes 1909, section 5862, cuts much deeper. This per force of the fact that we are obliged to consider the validity of our whole statutory scheme in determining the validity of the challenged act. Learned counsel for the relator has made an elaborate, fair and elegant analysis of our primary laws, and it is with pleasure that we adopt it. They say:

"Section 5862 is found in article 4 of chapter 43 of the Revised Statutes. This article was enacted in 1909, and is commonly known as the State Primary Law. It provides that all candidates for elective offices shall be nominated at a primary election held in accordance with this article, except special elections to fill vacancies, to elections for county superintendents of schools, city officers not elected at a general State election, to town, village or school district officers (Sec. 5855).

"The primary is held biennially on the first Tuesday in August (Sec. 5856). At least ninety days before the day of the August primary the Secretary of State transmits to each county clerk a notice designating the office for which candidates are to be nominated (Sec. 5857), and the county clerk causes such notice to be published (Sec. 5858). Every candidate is required to file a written declaration of his intention to become a candidate (Sec. 5859). Before filing his declaration papers the candidate is required to pay to the treasurer of the State or county central committee of the political party upon whose ticket he proposes to be a candidate, a certain sum of money, take a receipt therefor, and file such receipt with and at the time he files his declaration papers. For the office of circuit judge the sum of twenty-five dollars is to be paid to the treasurer of the state committee (Sec. 5860). Any person desiring to file declaration papers who is not a member of a political party having a State and county committee, or treasurer thereof, must pay the sum of money to the State or county treasurer, as the case may be (Sec. 5861).

"An official ballot shall be printed and provided for use at such election. The names of all candidates who shall have filed declaration papers shall be printed thereon (Sec. 5866). Separate tickets are provided for each party entitled to participate in the primary election and also for those persons who do not announce

as the candidate of any political party. If any elector write upon his ticket the name of any person who is a candidate for the same office upon some other ticket than that upon which his name is written, this ballot shall not be counted for such person (Sec. 5869).

"No person shall be entitled to vote at any primary unless a qualified elector and duly registered therein, if registration be required by law, and known to affiliate with the political party named at the head of the ticket he calls for and attempts to vote, or obligate himself to support the nominees of said party at the following general election (Sec. 5871). It is the duty of the judges of election to reject the ballot of any person attempting to vote other than the ticket of the party with which he is known to be affiliated unless such person obligates himself, by oath or affirmation, to support the party nominee of the ticket he is voting in the following general election (Sec. 5873). The provisions of the statute in relation to the holding of elections, the solicitation of voters at the polls, the challenging of voters, the manner of conducting elections, of counting the ballots and making return thereof, and all other kindred subjects shall apply to all primaries insofar as they are consistent, the intent of the article being to place primary elections under the regulation and protection of the laws now in force as to general elections (Sec. 5885).

"These provisions of the primary law taken in connection with section 5891, Revised Statutes 1909 (as amended by Laws 1913, p. 327) which provides that the official ballot used on the day of the general election shall have the names of candidates nominated by each party grouped together, each group headed by the name of the party, or principle which the candidates represent, and that the name of no candidate shall appear in more than one group, sufficiently indicate that the Legislature has provided a harmonious scheme whereby all fusion between political parties

State ex rel. v. Coburn.

upon any candidate is prohibited. *If one of these pro-visions, i. e., that no candidate shall file more than one declaration of his intention to become a candidate at the primary, that no vote cast for a person who is a candidate for the same office on another ticket shall be counted, that no name shall appear in more than one group on the ballot used at the general election, is in-valid, they are all invalid. If one of them is valid, they are all valid."*

The italics are ours. We agree with the counsel when they say: "The Legislature has provided a har-monious scheme whereby all fusion between political parties upon any candidate is prohibited," and we might add that political honesty would have been bet-ter preserved had the policy of the State always been thus. There is no good citizen of the State who has not at some time or another felt a sense of shame at some of the polit-ical fusions made, or attempted, in politi-cal campaigns. We say this freely, be-cause the misdoings have not been confined to any one party. Personally speaking, I be-lieve in political parties. So long as men think differ-ently upon vital governmental policies there will be dif-ferent political parties, and in my judgment they aid the State and the nation in that the one is the check upon the other. One watches the other with an eagle's eye, with the result that governmental service is main-tained at a higher standard. But whether we believe in the idea of political organizations or not, we will have them until such time as the mental make-up of man is changed from what it is at the present. It is a condition, and not a theory, which confronts us, and which has always confronted us. For years political parties were permitted by law to present their can-didates in their own way or ways. Charges of deceit and fraud were being constantly heard. The use of money to buy nominations has been charged. Chican-

*Margin note:* Regulation by Law of Political Parties: Fusion.

ery and trickery of different kinds were not altogether unheard of. Political "combines" were not uncommon, if the repeated charges had any semblance of truth. All these and much more. Such things, to say the least of them, were well calculated to disintegrate State morals, and to breed corruption and official dishonesty. Upon such a situation, the Legislature seized, and in the exercise of the police power of the State gave us the primary election laws as we now have them. To say that the State in the interest of good citizenship, and under the general welfare clause of the organic law, can not pass laws regulating in a general way the political parties of the State, would be to unwrite much that has been written by this and other courts. The only question is whether or not we have gone too far in the more recent enactments. We do not so think, for reasons to be presently assigned. To my mind there is no scheme so fraught with danger of fraud, deceit, dishonesty, corruption and all similar attendant ills as what is known as the political fusion. It is fraudulent, because fraud is practiced upon the unsuspecting voter by a few political leaders. It is deceitful, because when a candidate of one political faith permits his name to be placed on a ticket under a caption indicating a different political faith, deceit is tolerated and practiced. True it is that the leaders in politics may know that he is not of the political faith indicated by the ticket upon which he permits his name to go, yet the unsuspecting masses are deceived. This is common knowledge. So we might go through the whole category, but this will suffice. If political parties are born of honest differences of opinion, and the political name is understood as bespeaking given principles, it is a strain upon good morals for a man's name to appear upon two tickets, thus tacitly announcing that it is office he desires rather than the honest upholding of the tenets of his political faith. Such ideas deteriorate citizenship and ultimately work govern-

mental wrongs. Such practices lead to corruption, with its hordes of attendant evils. To say that the State in the exercise of its police power cannot strike at these evils would be to un-say what we have heretofore said. With these general observations, we now take up the points made by the distinguished counsel.

II.   Counsel for relator thus state their points:

"It is the contention of the relator that the clause violates the following sections of the Constitution of Missouri.

**Primary Election: Declaration of Candidacy: Two Parties.**

"Article 2, section 9, 'That all elections shall be free and open; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage.'

"Article 8, section 2, 'Every male citizen of the United States and every male person of foreign birth who may have declared his intention to become a citizen of the United States according to law, not less than one year nor more than five years before he offers to vote, who is over the age of twenty-one years, possessing the following qualifications, shall be entitled to vote at all elections by the people.

" 'First, He shall have resided in the State one year immediately preceding the election at which he offers to vote.

" 'Second, He shall have resided in the county, city or town where he shall offer to vote at least sixty days immediately preceding the election.' "

Does this statutory scheme violate article 2, section 9, of the Constitution? We use the term "statutory scheme" in lieu of the statute, section 5862, Revised Statutes 1909, because it is not only apparent, but conceded by relator in the brief, that the validity of the statute means the validity of the whole statutory scheme, and *vice versa*.

But taking the statute, section 5862, first, it can be safely said that it does not violate this constitutional provision, or other constitutional provision, for the reason that the word "elections" as used therein has reference to "choosing a person or persons for office by vote, and nowhere in the sense of nominating a candidate for an office by a political party." [Dooley v. Jackson, 104 Mo. App. l. c. 30; Commonwealth to use v. Wells, 110 Pa. St. 463; Mayor of Valverde v. Shattuck, 41 Am. St. l. c. 215; Commonwealth v. Kirk, 43 Ky. l. c. 2.] No one thought of political primaries regulated by law, when this organic law was framed, for it had its origin many years prior to the present Constitution.

Taking, however, the whole statutory scheme, which covers not only nominations to office, but elections to office, does this statutory scheme do violence to this provision of the Constitution? A part of this statutory scheme is section 5891, as amended in 1913. [Laws 1913, p. 327.] Perhaps it would be better to say, as repealed and then re-enacted in new form with additional matter added. The new statute thus reads:

"Every ballot printed under the provisions of this article shall contain the names of every candidate whose nomination for any office specified in the ballot has been certified or filed according to the provisions of this article, and no other names. The names of candidates nominated by each party shall be grouped together under the proper heading designating the political party by which the candidates composing said groups are placed in nomination. Each group on the ballot shall be headed by the name of the party or principle which the candidates represent, as indicated by the certificates of nomination. And each group shall so alternate on the ballot used in the several election districts or precincts that each group will appear thereon an equal number of times in the first column, and the last column and in each intermediate column. The

*name of no candidate shall appear in more than one group.* Underneath the name of each candidate shall be left a blank space sufficiently large to contain a written name.''

We have italicized *one* of the vital changes made in the statute. It would be folly to hold that section 5862 was unconstitutional and allow a candidate to be nominated on two or more political tickets, and then hold that section 5891 was constitutional, and that his name (although he had been duly nominated on two or more tickets) could be printed but once upon the blanket official ballot to be used at the election. The truth is, that there is a clear statutory scheme to prevent the attendant evils of fusion, and the statute attacked in the petition in this case (Sec. 5862, R. S. 1909) is but the entering wedge. It stands at the doorway of the statutory scheme, and for that reason the whole statutory scheme is attacked. We repeat, that the real question is, Does this statutory scheme do violence to section 9, article 2, of the Constitution? That all elections shall be ''free and open'' does not mean that there cannot be reasonable regulations of elections in the interest of good citizenship and honest government. This statutory scheme does prevent political bickerings and barterings for political advantages in elections, and the train of evils which follow such methods, but it does not prevent the disinterested citizen and voter from voting for whom he pleases at the general election. The statute says ''underneath the name of each candidate shall be left a blank space sufficiently large to contain a written name.'' This, for the very purpose of permitting the voter to vote for the man of his choice. He does not have to vote for the nominee of the party ticket he chances to use, but can vote for whom he pleases, whether the person of his choice has been nominated or not. [State ex rel. v. Hostetter, 137 Mo. 1. c. 645.] In the Hostetter case this court said:

"But even if we should concede that the vacancy caused by the death of Mr. Wheeler happened too late to permit of placing a formal printed nomination on the ballot, under the present ballot law, the people would nevertheless have the right to express their choice by writing on the ballot the name of any qualified person whom they desired to designate for any office which the law [section 1964] permitted to be then filled by election. The *electors are not restricted to the names or offices printed on the official ballot.* [People ex rel. v. Shaw, 133 N. Y. 493; People ex rel. v. President, 144 N. Y. 616; Sanner v. Patton, 155 Ill. 553; Cole v. Tucker, 164 Mass. 486.]

The italics are ours. This statute does not prevent the free exercise of suffrage. The voter is left free to vote for whom he pleases. Nor does the statute permit any power, "civil or military," to interfere "to prevent the free exercise of the right of suffrage." Under this statute, when the voter goes to the quietude of his booth to vote he has the absolute and unqualified right to vote for whom he pleases.

If therefore the Constitution has no reference to primary elections, as we have held, and if section 5891, supra, is not violative of the organic law, as we believe, then there is nothing in our statutory scheme against political fusions which violates the Constitution.

III. What we have said with reference to section 9, article 2, of the Constitution, supra, applies with equal force to section 2 of article 8, of that instrument. This section of the Constitution simply prescribes the qualifications of a legal voter, and guarantees to the citizen so qualified the right to vote. The Missouri statutory scheme does not invade this right as we have undertaken to show in the preceding paragraph.

*Qualification of Voter.*

IV.  In the brief learned counsel for relator says:
"The denial of the right of a person to be a candidate for the nomination of as many political parties as see fit to nominate him is an unreasonable restriction upon the right of suffrage, because it denies him the equality of opportunity, which is an essential feature of the exercise of the right of suffrage.  There must be an equality of opportunity so far as the electors are concerned, so that all those who possess the constitutional qualifications may take part in the primary, but there must be also an equality of opportunity so far as the candidates are concerned, so that the voter may vote for all candidates who choose to offer themselves for his suffrage.  And it is not enough that the voter shall be privileged to write in the name of any candidate he sees fit on his primary ballot."

*Equality of Opportunity to Become Candidate.*

Counsel in their zeal overlook the fact that they are attacking this section 5862, as violative of the Constitution, and that such instrument does not make reference to primary elections.  Where not prohibited by the organic law, the State lawmaker, in the exercise of the broad police power of the State, has a wide range in the enactment of laws.  These primary laws are but the exercise of the police power of the State, and in my judgment they eliminate great evils and are conducive to good morals.  The lawmakers were legislating to meet a situation.  Political parties we had, and always will have, and fraud in political nominations to office was the constant cry.  This court cannot ignore public State history.  The State was forced to seize the situation, and did so, in the exercise of its police power.  In so doing it has but attempted to prevent fraud, deceit and corruption in party nominations.  There being no constitutional inhibition upon the subject the sovereign State was left with a free rein.

State ex rel. v. Coburn.

But leaving this phase of the case and going to the question propounded by counsel. Does this statutory restriction deny to the candidate ''the equality of opportunity which is an essential feature of the exercise of the right of suffrage?'' Under the primary law each candidate can file one written declaration of his candidacy. No other candidate can file more, and where is the discrimination? In fact it is discrimination which relator wants. He wants to declare that he is both a Republican and a Progressive in two separate and distinct declarations, when perhaps the good conscience of other aspirants would not allow them to make two declarations of candidacy so divergent in principles. But going back again to the question. The candidate can have his name printed on the official ballot at the general election once in one column or group. No other candidate can do more. The candidate can be voted for by any voter on any other ticket by the voter writing his name in the place provided therefor by the law. No other candidate can have more rights. In fact to permit one candidate to have his name printed upon more than one of the official groups would be to discriminate in his favor, because forsooth his conscience would permit him to stand upon two divergent platforms or principles, when other candidates might not be so fortunate in their mental and moral make-up.

We are impressed with the view that the statute treats all aspirants for office fairly. It may be that it prevents them from practicing deceit by keeping their names out of political groups with whose party principles the particular candidate's political views do not accord, but if so, it is a most righteous act. It may be that it will prevent political committees and other political agencies from making corrupt and immoral political fusions in sacrifice of political principles and against the wishes of the masses of their respective parties, but if so, it is to be commended rather

than condemned. The political history of Missouri is not without some blots of the character indicated, and no one particular leading party has been the sole offender.

It may be that I speak feelingly upon this matter, but I am impressed with the view that political preferment should not come at the hands of deceit, or through the sacrifice of honestly formed political faiths and principles. Party fusions encourage both deceit and the sacrifice of political principles for self-preferment. In State ex rel. Bateman v. Bode, 55 Ohio St. l. c. 229, 34 L. R. A. l. c. 499, the Ohio Supreme Court thus speaks:

"It seems clear that the placing of the name of each candidate upon the ballot once, and only once, would be equal protection and benefit to all the candidates. To place the name of one on the ballot in two places, and the name of his opponent in only one place, would not be exactly fair. It would give the candidate whose name appears twice an advantage over the candidate whose name appears but once. So that the statute, instead of being in conflict with this section of the Constitution, is in harmony with it, and may have been passed for the purpose of doing away with this advantage which existed under the former statute. It is a proper regulation of the elective franchise, well calculated to avoid and prevent corruption and fraudulent practices, as well as undue advantage to one candidate over another.

"But it is argued that the voters have a right to have the names appear upon both ballots, so that they may more easily vote for the candidates of their choice. No legislature and no court can know in advance how the electors desire to vote, and if an opportunity is given them to vote for the candidates of their choice, by placing the names once, in plain print, upon the ballots, it is all that can in fairness be required. The ballot is the same for all, and gives equal protection

and benefit to all. There is no discrimination against or in favor of any one; and, if any inequality arises, it arises, not from any inequality caused by the statute, but by reason of inequalities in the persons of the voters, and such inequalities are unavoidable."

Further on in the same case that court adds:

"The act in question was passed to secure purity in our elections. Certain evil practices had grown up by reason of placing the name of a candidate upon the same ballot more than once, and the General Assembly attempted to prevent such practice by providing that the name of each candidate should appear on the ballot but once. This is a reasonable regulation of the elective franchise, and not in any sense a destruction thereof. But grant, as it is urged by the relators, that some voters may be somewhat inconvenienced, by reason of the name of each candidate appearing but once upon the ballot; yet such voters are not thereby deprived of any protection or benefit in casting their ballot. The inconvenience is only that which is experienced by everyone who votes other than a straight ticket. Such slight inconvenience to the voter should be endured, rather than permit the advantage which one candidate has over another when the name of one is placed upon the ballot twice, and the name of the other but once.

"The subject is clearly within legislative discretion, and that body has the power to provide that the name of each candidate shall appear but once upon the official ballot, or it may permit the name to appear more than once."

The Michigan Court in Todd v. Election Commissioners, 104 Mich. l. c. 487, 29 L. R. A. l. c. 336, thus disposes of the question:

"It is also insisted that the candidate has the constitutional right to have his name appear upon the ticket of every party which indorses him. It gives every candidate the right to have his name appear upon

the ticket once. Naturally, it belongs in the column of that party with which he is openly affiliated; but if he chooses to have his name attached to the ticket of some other party, and that party does not object, he possesses that right. But I know of no reason or authority for saying that any candidate possesses the constitutional and inalienable right to have his name appear more than once upon the official ballot containing the tickets of two or more political parties. The Australian ballot contemplates that his name shall be there but once. It follows, then, that every voter has a reasonable opportunity to vote for him. This is the sole constitutional right guaranteed him. He has no occasion to find fault so long as he is permitted to have his name upon the ballot upon such ticket as he chooses, with the constitutional right following of an opportunity given to every voter to vote for him, which he can do by simply making two crosses instead of one. The law is general, and aims at no political party. One party may be affected at one election, and another at another, or all parties may be affected at one election, some in one locality and others in another.''

In State of North Dakota ex rel. v. Porter, Secretary of State, 13 N. D. 1. c. 409, 67 L. R. A. 1. c. 474, the North Dakota court thus speaks:

''Counsel for relator contend that the portion of the statute which prohibits the printing of a candidate's name in more than one column is unconstitutional and void, and that it is not within the power of the Legislature to deny to him the right which he asserts, i. e., to have his name printed in his party column as a party candidate by virtue of his party nomination, and also in a separate column by virtue of his nomination by petition of electors. This particular provision is not peculiar to this State, and the question of its constitutionality is not a new one to the courts. It is contained in the Australian ballot laws of Wisconsin, Ohio, and Michigan, and in each of these

States it has been held constitutional. [State ex rel. Runge v. Anderson, 100 Wis..523, 42 L. R. A. 239; State ex rel. Bateman v. Bode, 55 Ohio St. 224, 34 L. R. A. 488, 60 Am. St. 696; Todd v. Election Comrs., 104 Mich. 474, 29 L. R. A. 330.] California has a provision somewhat similar. In that State it was held unconstitutional by a divided court. [Murphy v. Curry, 137 Cal. 479, 59 L. R. A. 97.]"

In the case of State ex rel. v. Superior Court, 60 Wash. 1. c. 379, the Washington Supreme Court, after quoting from and approving the doctrine of the Ohio, Michigan and North Dakota courts, quoted by us, supra, then adds:

"As against the reason and logic of these decisions, we have the case of Murphy v. Curry, 137 Cal. 479, 59 L. R. A. 97, holding that a similar statute was unconstitutional. This case stands alone. It was finally repudiated by a constitutional amendment. The case was decided by a divided court, a bare majority declaring the rule. The court clearly put itself in the place of the Legislature and determined the law, not upon constitutional grounds, but rejected it as unwise, impolitic, and inexpedient. The case proceeded upon two false theories, as is made plain by reference to the dissenting opinion of GAROUTTE, Justice, the one the inconvenience of the voter, and the other the denial of a right to a political party."

The Illinois Court has approved of the same rule. In the case of People v. Czarnecki, 256 Ill. 1. c. 326, it is said:

"In many of the States the statutes provide that a candidate's name shall appear but once upon the ballot, and the constitutionality of this provision has been called in question in various States, and has been sustained by the Supreme Courts of Michigan, North Dakota, Ohio, Washington and Wisconsin. [Todd v. Election Comrs., 104 Mich. 474; State ex rel. v. Porter, 13 N. D. 406; State ex rel. v. Bode, 55 Ohio St.

224; State ex rel. v. Superior Court, 60 Wash. 370; State ex rel. v. Anderson, 100 Wis. 523.] It was held unconstitutional in New York (Hopper v. Britt, 203 N. Y. 144), and by a divided court in California. [Murphy v. Curry, 137 Cal. 479.]''

The reasoning of the Hopper v. Britt case, supra, is apparently fallacious, when read with calm judicial deliberation.

The Supreme Court of Nebraska, in State ex rel. v. Wells, 92 Neb. l. c. 339, 41 L. R. A. (N. S.) l. c. 1092, in discussing primary statutes broader and more liberal in some respects than ours, use this language:'

''It is not necessary, in order to preserve the rights of the voter at the general election, that the name of a candidate should appear on the ballot more than once, nor is it necessary that he should be described on the ballot at the general election as a member of more than one political party; and the Legislature, to carry out the idea of a closed primary, may well provide that the average voter shall not be deceived by a statement on the ballot at the general election that a candidate belongs to or affiliates with two antagonistic political parties when those parties have not affiliated, and the candidate has declared under oath that he affiliates with one of them, and has refused and neglected to state that he affiliates with the other. In every instance in which the statute, as it now is, mentions the qualifications of a candidate of a political party at the primary election, it prescribes affiliation with the party for which he proposes to be a candidate as a necessary qualification. All provisions of the open primary law which recognize the right to become a candidate of a political party without that qualification were repealed when the closed primary was provided for. Voters must declare their party affiliations when they register, and also when they vote at the primaries; and if their right to vote is challenged they must then declare their party affilia-

tion. If they nominate candidates to be voted for at the primary election, they must declare that they affiliate with the party whose candidate they seek to nominate; and the law requires that a record be kept of the party affiliations of the voters. In all the cases provided in the statute, the candidate for nomination at the primaries must declare his party affiliation. The right to be a candidate at the general election and to have a place upon the printed ballot for that purpose is provided for. He may be such candidate independently of all parties; or if he affiliates with any political party, he may have his name upon the ballot at the general election as the candidate of that party. If two or more political parties are affiliated for any general election, he may of course affiliate with both or all of them, and become their candidate accordingly.

"But no political party can be compelled to put forward as its candidate one who does not affiliate with it. The voter at the general election may vote for whom he pleases, *but may not be deceived by false labels. It surely is within the power of the Legislature to prevent such deception, and we think it as clearly appears that it has intended to do so."*

The italics are ours. The Nebraska statute seems to contemplate that under given conditions there may be coalition between political parties, which make them broader than ours. Otherwise there is much similarity. Under our primary act the voter must vote the ticket of the party with which he has been affiliated, or he must under oath declare his intentions to vote another ticket at the general election. Under our law he may be challenged if he is a Democrat and undertakes to vote a Republican primary ticket and *vice versa*. The whole statutory scheme is one well calculated to prevent "false labels" as said by the Nebraska court, and to crush fraud and deceit as said by other courts.

State ex rel. v. Coburn.

Not only is the statute specifically attacked in relator's petition valid, but the whole statutory scheme, of which such statute is but the initial step, is likewise impervious to alleged constitutional darts. It follows that our alternative writ of mandamus should be quashed and our peremptory writ refused. It is so ordered.

*Woodson* and *Walker, JJ.*, concur *in toto; Lamm, C. J.*, and *Bond* and *Faris, JJ.*, concur in result; *Brown, J.*, dissents in opinion filed.

## DISSENTING OPINION.

BROWN, J.—I find myself unable to concur in either the views expressed or the conclusion reached in this cause by the majority opinion.

I. That provision of our organic law which ordains that "all elections shall be free and open" is but an echo of the second paragraph of our Declaration of Independence which announces the self-evident truth that the right to govern is derived from the consent of the governed. This declaration is one of the cornerstones upon which rests the stability of our Government and that of each of the States thereof. This declaration does not mean that governmental powers shall rest upon the consent of all the governed—such unanimous consent is impossible of attainment—but, in a broad general sense, it does mean that the people ought not be ruled by a minority of the qualified electors thereof. In harmony with this view it has been ordained that a President of the United States can only be elected by a majority of the electoral college, and that where no candidate receives a clear majority of the electoral votes there is no election, and the National House of Representatives (elected by the people) must choose the President (even though to do so a fusion between Congress-

Rule of Minority.

men of different political faiths becomes necessary). [Twelfth Amendment to the Constitution of the United States.]

Similar laws are in force in Vermont and other States which were organized before the Declaration of Independence was in a measure forgotten.

These general remarks are made to illustrate the fact that the founders of our Government deemed the consent of a majority of the voters indispensable to a just power to govern. Consequently, a law which tends to prevent a voluntary coalition of political parties, thus permitting a mere plurality or minority of the voters to elect the officers, is at variance with the theory upon which our nation was founded, and, therefore, unsound.

II. I dissent from the views of my learned brother, wherein he lends his general approval of the constitutionality of our present primary system. That clause of our Constitution which ordains that all Free and Open Elections. elections shall be *"free and open"* can mean nothing less than that every eligible person may freely aspire to office, and receive the same, if the voters so direct. Consequently, section 5860 of our statutes, which requires candidates to pay money to the treasurer of a political party in order to have their names printed upon the ballots at a primary or general election, is doubtless invalid. I have never been able to find any lawful power vested in the General Assembly to place a dollar mark upon anything which the framers of our organic law have said shall be *free*.

The expense of holding our general primary elections is borne by the several counties of the State, or, more accurately speaking, by the tax payers thereof, and that section of our statute which requires aspirants for office to pay money to the treasurer of a political party in order to become eligible as candidates at

primary elections is not only unconstitutional, but, in fact, is a monstrous fraud upon all persons running for office, as well as the State itself. Just think of the State by solemn law requiring the involuntary payment of a fund for political purposes—a fund which may, perchance, be used in corrupting the electorate, and thereby defeating the will of the people!

Section 18 of article 2 of the Constitution of Illinois provides that all elections in that State shall be "free and equal." This is so nearly the same as the "free and open" provision of our Constitution that it amounts to a distinction without a difference. Under the above-quoted clause of the Constitution of Illinois, a primary-election law was enacted, which, like our own, required candidates for public office to pay certain stated sums into the public treasury. That law was less objectionable than ours, because it required the fee or tax levied upon candidates to be paid into the public treasury, while ours requires it to be turned over to a political "slush fund." Yet the Illinois primary election law above mentioned was held to be unconstitutional, because it required a fee to be paid for the privilege of aspiring for office. In declaring that law invalid, the Supreme Court of Illinois said:

"Other provisions of the act require a cash payment from persons desiring to become candidates for certain offices. It is provided that any one desiring to become a candidate for Governor or United States Senator shall pay, on filing a petition of legal voters, a filing fee of $100. Each Congressional candidate must make a payment of $100, each candidate for senator $50, each candidate for member of the House of Representatives $25, and in Cook county a candidate for mayor must pay $75 and a candidate for alderman $25. These payments bear no relation to the services rendered in filing the papers or the expenses of the election. They are purely arbitrary exactions of money, to be paid into the public treasuries as a mone-

tary consideration for being permitted to be a candidate. The payments are not intended as compensation for services rendered in filing the papers, but the provisions make the ability and inclination of a person to pay money a test of his qualification and of the right of the voters to choose him for public office. Every eligible person has a right to be a candidate for a public office without being subject to arbitrary or unreasonable burdens. The voters have a right to choose any eligible person, and he owes a duty to the public to qualify and serve. [People ex rel. v. Williams, 145 Ill. 573.] Reasonable regulations, such as a petition from a proper percentage of voters which would show that they want the privilege of voting for a person, or other reasonable conditions or restrictions, may be imposed. If there were no such conditions the ballot might be so large as to be impracticable, but there can be no discrimination between candidates based upon the ground that one has money to pay for the privilege of being a candidate and chooses to pay, and another has not the means or is unwilling to buy the privilege. The only reply of counsel for defendants on this subject is, that a candidate can be nominated without having his name printed on the ballot; that he may have his name written in and a square placed in front of it and a cross put in the square, and if he secures enough votes in that way he will be the nominee of the party. That argument does not call for much attention. It is a foregone conclusion that the candidate will be chosen from those whose names are on the primary ballot, and it is no answer to the argument against an illegal and arbitrary discrimination in favor of one who is able and willing to make a cash contribution and against one who is unable or unwilling to do so, to say that the voters may write the name of a candidate on the ticket and make a square in front of it and put a cross in the square. The Supreme Court of the State of Ne-

braska, having under consideration a similar provision which was held to be illegal and void, said: 'To say that the voters are free to exercise the elective franchise at a general election for nominees in the choice of which unwarranted restrictions and hindrances were interposed would be a hollow mockery.' [State v. Drexel, 74 Neb. 776.] But this act makes no provision for blank spaces and squares for the insertion of names of candidates who have not paid their money. It does provide that all the general election laws of this State shall be in full force and effect where the same are not in conflict with the act. If that provision could be said to authorize the writing in of names on the primary ballot because provision is made in the ballot law for doing so, it would be only by indirection; and it cannot have that effect for the reason that the provision of the ballot law is in conflict with this act. It is the plain intention of the Legislature, apparent on the face of the act, that no one shall be voted for at the primary election except those who have contributed the cash to the public treasury. The provisions by which the candidates are required to buy their way to office are an unwarranted hindrance and impediment to the rights of the candidates and voters alike, and are illegal and void." [People v Election Comrs., 221 Ill. l. c. 21-23.]

III.   Another provision of our primary law ordains that the judges at a primary election may determine to what political party voters belong, and, in cases of doubt, may swear the person offering to vote to support the nominees of the party whose ticket he desires to vote in the primary. [Sec. 5873, R. S. 1909.]

Swearing Voters to Support Nominees.

I cannot bring myself to believe that the legislator who penned the last-mentioned section of our primary election law had ever read our Constitution. It is certainly more probable that he had been reading

some oath of allegiance, than that he had read and digested the command of our Constitution requiring all elections to be free and open. Just think of swearing a voter to support the nominees of a party at a time when he does not know who such nominees will be! The voter having a right to change his mind at any time before his ballot is cast at the general election, this law requiring him to take an oath to support the nominees of a party is not only unconstitutional, but amounts to a rape upon the personal rights of the person thus sworn. Consider the folly of pretending to authorize a judge of election to search the conscience of a free elector and determine what kind of a ticket he ought to vote. We have recently witnessed the spectacle of four million voters of this republic changing their political allegiance in ninety days. Outside the Almighty, who possesses sufficient wisdom to say on what day each of those four million electors changed their minds, or on what day they, or others, will not change their political allegiance? In my humble opinion section 5873, Revised Statutes 1909, is not only in conflict with the Constitution, but is a malevolent attempt to drive free American citizens along certain narrow partisan channels like cattle in a lane, without according them an opportunity to think and choose for themselves.

IV. Another view expressed in the majority opinion which I do not approve, is that the constitutional provision requiring that "all elections shall be free and open" does not apply to primary elections. If the voters cannot have a fair opportunity to select the candidates for whom they wish to cast their ballots at the general election, then a free and open general election would, in many cases, prove a hollow mockery. Just as well say that a man compelled to wear fetters is free because those same fetters will be taken off as soon as he is dead.

The holding of a majority of my brethren on this point seems to me to be as illogical, strained and untenable as the former rulings of this court which prevented the judicial opening of ballot boxes to detect and stamp out election frauds—a doctrine which, I am pleased to say, was expressly repudiated by the learned jurist who penned the majority opinion in this case. [Gantt v. Brown, 238 Mo. 560.]

V. I concur in the announcement that political parties are a necessity. I go further by saying that they are frequently a blessing. They often enable persons possessing similar ideas on governmental matters to secure the enactment of their views into laws, and when those views are sound the State or Nation prospers. Yet the danger is always present that when a political organization has attained great strength it will use that strength to rob or oppress the people; consequently a disorganization or temporary abatement of a political party is sometimes a greater blessing than was its original organization. The people should be allowed a free hand not only in building up political parties, but also in abating such parties when from any cause they become a menace.

VI. I do not share the apprehension of a majority of my brethren that voters will be deceived by placing the names of candidates upon the primary ticket of more than one political party; the electors are necessarily required to consider the persons whom they desire to vote for or against at the primary, as well as at the general election, and my observation is that they can be relied upon to choose with discretion and wisdom. They do not need to have a law to guide them along narrow channels like blind-bridles used upon skittish or unbroken horses.

In most every primary election there are names of persons printed upon the ballots which the voters

do not wish to nominate, persons who are not intellect-
ually qualified to fill the office to which they aspire, or
who are not morally fit to be intrusted with office.   To
my mind it is unthinkable, if the name of a Democrat
were printed upon a Republican primary ticket, or
*vice versa,* that the voters would not possess enough
intelligence, with the aid of the public press, to erase
that name if they so desire.   On the other hand, sup-
pose a Democrat was so popular that the Republican
voters preferred him to any one of their own faith,
and should nominate him and give him their votes,
what possible harm could arise from that fact?

In the State of New York it is a common custom
to nominate the same men for judges of the courts
upon both Democratic and Republican tickets, that of-
fice being classed as non-political.   The same benignant
rule has been voluntarily adopted in many parts of
Missouri in choosing school officers, and if fraud, cor-
ruption or any other kind of harm has resulted from
this practice I have never heard of it.

VII.   I approve of the plan of nominating candi-
dates by primary elections, because it gives the people
—those who pay the taxes and are interested in se-
curing the election of honest and competent officers—a
direct opportunity to nominate the persons to be voted
for.   I admit that the regulation of such primaries by
fair laws is a proper function of the General Assem-
bly.   In so far as the primary election law of Missouri
tends to afford the voters an opportunity to select can-
didates of their own choosing it is well enough, because
it is in furtherance of the constitutional command that
elections shall be free and open.   A majority of my
brethren seem to think that a law which permits one
or more political parties to fuse or coalesce through a
primary election law is immoral, and that anti-fusion
laws should have been enacted at an earlier date;
"that there is no good citizen of our State who has

State ex rel. v. Coburn.

not felt a sense of shame at some of the fusions made.''
Fusions there may have been through the conniving
of political conventions and political committees which
were immoral and dishonest, but, according to my best
judgment, more fraud and general rascality can be
pulled off in one convention than at a dozen primary
elections.   Therefore, I suspect that the criticism of
my brother must have been directed at the misdeeds
of political committees and conventions.   That is not
the case at bar, for this suit is brought to enable the
voters of two political parties to coalesce through the
action of voters themselves in the nomination of a
circuit judge of Jackson county.   If the voters of the
Progressive and Republican parties, which, by the elec-
tion returns we judicially know, were each in the min-
ority in the last general election, can pool their strength
and elect a judge by a majority of the total votes to
be cast, then the principle that all power is derived
from the consent of the governed will become a reality,
while if some other party casting less than a majority
of the popular vote shall elect the judge, then he will
hold his office, not by the consent of the governed, but
by the consent of the minority of the governed.   Un-
doubtedly under our present system a man may be
elected by a bare plurality, but I am not prepared to
commend the wisdom of such a law.

VIII.   A great deal that is said in the majority
opinion amounts to a criticism of the immoral ten-
dency of political fusions.   This is, of course, outside
the real controversy in this case.   I know
that occasionally a man can be found whose
political convictions are so strong that he
will not vote with any other political party whose ten-
ets are at variance with his own, even in the slight-
est degree; but I do not believe that this view is at all
general, nor do I believe that political fusions have

brought "a sense of shame" to the voters who have participated therein. Political fusions among minority parties often serve as a check upon arrogant majority parties, or rather political parties whose thorough organization has enabled them to repeatedly elect officers that are dishonest and corrupt.

It is within the personal recollection of every member of this court that the Republican party, with its well organized political machinery, was able to elect dishonest men to the municipal offices of the city of Pittsburg; and a like well organized Democratic machine was able to elect dishonest men to public office in the city of New York. The result (a natural one) was that in each of those cities official misconduct became so rampant that the scandals and odors of official corruption "literally ascended to Heaven," and the miscreants could only be ousted and better government obtained by a coalition or fusion of all the voters who did not owe allegiance to the aforesaid political machines.

Only a few years ago the Democrats and Republicans of the city of San Francisco fused upon their candidates for municipal offices in an effort to defeat what was called the "Labor Ticket." The Democratic-Republican fusion did not succeed, but it would doubtless have been better for the city if it had, because the officers selected on the anti-fusion or "Labor Ticket" were guilty of such gross frauds that the city was disgraced and many of its officers sent to the penitentiary. I merely cite these instances to demonstrate the fact that while the right of political parties to fuse or coalesce may sometimes result in dishonest political trades, etc., it has doubtless resulted in the elimination of three corrupt officers to every dishonest man it has placed in office.

IX. Coming nearer home, I wish to quote a few figures to illustrate the fact that political **Tends to Full Vote.** fusions do not create that "sense of shame" among honest voters which the majority opinion announces.

In the year 1892 one Grover Cleveland was nominated by the Democrats for President of the United States—he had served one term in that office and was well and favorably known—his governmental policies were all well understood. Pitted against him on the Republican side was Benjamin Harrison, who had likewise held the office of President one term, and, like Mr. Cleveland, was regarded as a safe and strong statesman. The political issues which the two candidates represented were sharply drawn. Good men were running on the tickets of both of the great parties for State offices. There was no political fusion, and, so far as I know, none thought of. Yet the total vote cast in our State in 1892, according to the official election returns, of which we can undoubtedly take judicial notice, only amounted to 541,583. At the presidential election four years later the Democrats were fused with the Populists in an effort to elect Mr. Bryan, and an aggregate of 673,906 votes were polled in Missouri for the several candidates for President—a gain of 132,323 votes in four years. Since 1896 the desire for fusion has fallen into voluntary disuse, and the result is that in 1912 the vote for President in Missouri was only 698,562, or a gain in the popular vote of only 24,656 in sixteen years. It is my candid opinion that there were at least 100,000 qualified electors in Missouri who did not vote in the election of 1912. These figures suggest that the right of political parties to fuse upon candidates is popular with the people. It tends to bring out a full vote, and thus secures the election of officers by the "consent of the governed."

X. The concrete case before us is the right of the Republicans and Progressives to coalesce or 'fuse upon their candidate for judge of the circuit court of Jackson county—an officer who it is generally conceded should be selected on account of his legal ability and integrity rather than his allegiance to any political party. If a majority of the persons voting the Republican and Progressive tickets were allowed to cast their ballots at the ensuing primary for relator the fusion as to him would be complete; but if not so chosen, there would be no fusion. I think the writ should have been granted as prayed, and the anti-fusion law declared unconstitutional.

*Judicial Officer.*

I have given my views on this important question without taking the time or space to cite the numerous decisions from other States which sustain my position. My brother GRAVES has frankly conceded that anti-fusion laws in many other States have been declared invalid, and my only regret is that he could not see his way to so adjudge the unjust anti-fusion law of Missouri.

This case is already decided and my dissent is written from an abiding conviction that the majority opinion is wrong and cannot, and will not, stand the test of time.