Kathleen WEINSCHENK,
et al., Respondents,

v.

STATE of Missouri, Appellant,

Robin Carnahan, Secretary
of State, Respondent,

Dale Morris and Senator Delbert Scott,
Intervenors–Appellants.

No. SC 88039.

Supreme Court of Missouri,
En Banc.

Oct. 16, 2006.

*AT & T Wireless Servs. Inc., et al.,* SC87208, 203 S.W.3d 197, 2006 WL 2257066.

Jeremiah W. (Jay) Nixon, Atty. Gen., Mark E. Long, Asst. Atty. Gen., Jefferson City, for Appellant.

Mark F. (Thor) Hearne, II, St. Louis, James B. Deutsch, Jefferson City, Alok Ahuja, Kansas City, for Intervenors-Appellants.

Barbara Jane Wood, General Counsel, Secretary of State, Jefferson City, Don M. Downing, Erica L. Airsman, St. Louis, for Respondents.

Women's Voices Raised for Social Justice, AARP, Missouri Women's Coalition, Jewish Community Relations Council and Missouri Now, Cynthia S. Holmes, Clayton, Daniel B. Kohrman, Washington, D.C., National Assn. for the Advancement of Colored People, Inc., Missouri Citizens Education Fund, Grass Roots Organizing, The Whole Person, Disabled Citizens Alliance for Independence, Southwest Center for Independent Living, Lawyers' Committee for Civil Rights Under Law, The American Civil Liberties Union Foundation, Inc., People For the American Way Foundation, and Mexican American Legal Defense and Educational Fund, Arthur A. Benson, II, Jamie Kathryn Lansford, Arthur Benson & Associates, Kansas City, Jonathan D. Siegfried, John M. Nonna,

John C. Cleary, Henry L. Solano, Richard J. Cairns, Benjamin J. Ferron, Leboeuf, Lamb, Greene & Macrae, LLP, New York, New York, Jon Greenbaum, Ben Blustein, Marcia Johnson-Blanco, Lawyers' Committee for Civil Rights Under Law, Washington, D.C., Elliot M. Mincberg, David J. Becker, People for the American Way Foundation, Washington, D.C., Meredith Bell-Platts, Neil Bradley, American Civil Liberties Union Foundation, Inc., Atlanta, GA, Dennis Hayes, NAACP, Inc., Baltimore, MD, Amicus Curiae.

PER CURIAM.

After a 2006 statute was enacted requiring registered voters to present certain types of state- or federally-issued photographic identification in order to cast regular ballots, Ms. Kathleen Weinschenk and others sued the state to block enforcement of the law on the grounds that it interfered with the fundamental right to vote as protected by the Missouri and United States constitutions. Ms. Weinschenk and the others claimed that the new law required them and other voters—particularly those who are low-income, disabled or elderly and who do not have driver's licenses—to spend money to obtain the necessary documents such as birth certificates in order to obtain the requisite photo ID. The trial court declared the law unconstitutional.

The State of Missouri and Intervenors Dale Morris and Senator Delbert Scott (collectively "Appellants"),[1] appeal the trial court's holding that the portion of Senate Bill 1014 ("SB 1014") requiring presentation of certain forms of photographic identification ("photo ID") to vote is unconsti-

tutional because it violates Missourians' rights to vote and to equal protection of the laws. These rights are at the core of Missouri's constitution and, hence, receive state constitutional protections even more extensive than those provided by the federal constitution. The trial court so held because it found that those portions of SB 1014, which now are found at Section 115.427, *2006 Mo. Laws 728–32*,[2] ("Photo–ID Requirement") unnecessarily burden the right to vote of Missourians who are properly registered but are nonetheless barred from voting at their designated voting precinct (or permitted to vote only provisionally) because they do not have one of the limited types of identifying documents required by SB 1014 to exercise their right of suffrage.

This Court agrees that SB 1014's Photo–ID Requirement violates Missouri's equal protection clause, *Mo. Const. art. I, sec. 2*, and Missouri's constitutional guarantee of the right of its qualified, registered citizens to vote. *Mo. Const. art. I, sec. 25; art. VIII, sec. 2*. While this Court fully agrees with Appellants that there is a compelling state interest in preventing voter fraud, the evidence supports the trial court's conclusion that the Photo–ID Requirement is not narrowly tailored to accomplish that purpose.

Witnesses in the trial court did testify to past instances of fraud in the form of absentee ballot and registration fraud. But, as Appellants acknowledge, the Photo–ID Requirement is intended to prevent only impersonation of a registered voter and will not affect absentee ballot or regis-

---

1. Plaintiffs filed a petition against the State of Missouri and Secretary of State Robin Carnahan (who appears on appeal as a Respondent) seeking a declaratory judgment that SB 1014 was unconstitutional. Dale Morris and Senator Delbert Scott were granted permission to intervene. The Court compliments all coun-

sel and the trial court for their excellent analyses of the complex legal issues here presented in the short time available to them.

2. Unless otherwise noted, references to section 115.427 are to *2006 Mo. Laws 728–32*.

tration fraud. The evidence below shows, however, that our legislature has already eliminated the opportunity to commit voter impersonation fraud with the enactment of the precautions it adopted in response to the federal *Help America Vote Act ("HAVA")* in 2002.[3] In fact, the only specific instance of possible fraud that has occurred since 2002 of which the witnesses were aware involved an attempt (whether intentional or accidental is not clear) by a person who had voted absentee to then vote in person. This conduct would not be affected by SB 1014 and was discovered and prevented prior to the implementation of the Photo–ID Requirement.

Appellants argue that the Photo–ID Requirement nonetheless should remain in place because it will reassure voters who "perceive" that fraud exists. As there has been no reported case of voter impersonation fraud since the HAVA protections were put in place, however, this justification places too great an encumbrance on the right to vote of Missourians who cannot show the very specific and often costly to obtain photo IDs the statute requires.

The statute does provide an alternative identification procedure that will allow voters who lack one of the specified photo IDs to cast a provisional ballot in certain elections between now and November 2008, but these transitional provisions are not severable from the permanent provisions, so this Court need not decide the question of their constitutionality.

Accordingly, the trial court judgment enjoining enforcement of the Photo–ID Requirement of SB 1014, now section 115.427, is affirmed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

SB 1014's Photo–ID Requirement prohibits otherwise qualified and lawfully registered Missourians from voting if they present only out-of-state picture identification, social security cards, utility bills, school or work IDs, or other documents that served as proper identification under the version of section 115.427 in effect prior to the enactment of SB 1014.[4] *See sec. 115.427.1, RSMo Supp.2005.* As amended by SB 1014, section 115.427 now requires that Missourians present as identification a document issued by the state or federal governments that contains the person's name as listed in the voter registration records, the person's photograph, and an expiration date showing that the ID is not expired. *Sec. 115.427.1.*[5] In practical effect, the only documents that most Missourians would have that could meet these requirements are a Missouri driver's or non-driver's license or a United States

3. Codified at *sec. 115.427, RSMo Supp.2005.*

4. The dissent's citation to reports by Missouri Secretaries of State Cook and Blunt of attempts to vote in 2000 by unregistered or improperly registered persons concerns elections prior to the legislature's amendment of section 115.427 in 2002 to add a requirement that "voters shall identify themselves by presenting a form of personal identification" from the list enumerated in the statute. *Sec. 115.427.1, RSMo Supp.2005.* Prior to this amendment, state law did not generally require Missouri voters to present any identification in order to vote. The 2002 amendment brought Missouri into compliance with the Help America Vote Act ("HAVA"), passed by Congress in 2002. The list of acceptable forms of identification included in Missouri's pre–2006 statutes are drawn directly from HAVA. *See Help America Vote Act, Pub.L. No. 107–252, 116 Stat. 1666.*

5. SB 1014 also contains transitional provisions that would allow voters who lack the requisite photo ID to cast provisional ballots through November 1, 2008. *Sec. 115.427.13.* The transitional provisions, discussed in the dissent, will be addressed in section III below.

passport.[6]

The record below reveals that between 3 and 4 percent of Missouri citizens lack the requisite photo ID and would, thus, need to obtain a driver's or non-driver's license or a passport in order to vote. Specifically, the trial court noted that the Secretary of State's analysis in August 2006 estimated that approximately 240,000 registered voters may not have the required photo ID and that the Department of Revenue's estimate of the same was approximately 169, 215 individuals. Each of these forms of ID, however, normally costs money to obtain. This presents a practical problem for Missourians who will be discouraged from attempting to vote because of concern that they must pay a fee to do so. It also presents a legal problem in that the United States Supreme Court held in *Harper v. Virginia State Board of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), that any tax or fee imposed on the right to vote presents an undue burden on the exercise of that right. As the high court stated, wealth or payment of money should have no relation to the free exercise of the right to vote. *Harper*, 383 U.S. at 668, 86 S.Ct. 1079 ("To introduce wealth or payment of a fee as a measure of a voter's qualifications is to introduce a capricious or irrelevant factor").

The legislature provided that Missourians who lack a proper unexpired photo ID may obtain a Missouri non-driver's license free of charge. *Sec. 115.427.7*. To aid them in doing so, SB 1014 provides that "mobile processing units," at which these free non-driver's licenses can be obtained, will be made available upon request to "any disabled or elderly person otherwise competent to vote ... [who is] physically unable to otherwise obtain" a non-driver's license. *Id.*

SB 1014 also provides a mechanism for waiving the Photo–ID Requirement for certain classes of persons who are otherwise registered and meet all of Missouri's constitutional qualifications to vote but, under SB 1014, nonetheless would be denied the right to vote for lack of a proper ID. Those persons can cast a "provisional ballot" if they sign an affidavit swearing that the reason they have no acceptable photo ID is that they are unable to obtain such identification because of a disability or handicap, because of a sincerely held religious belief, or because they were born on or before 1941. *Sec. 115.427.4*. Lack of funds or time to undertake the sometimes laborious process of obtaining a proper photo ID in situations in which a birth certificate is not easily available or in which a woman has changed her name since birth are not grounds for casting a provisional ballot under this provision.[7]

In addition, the provisional ballot will not be counted unless the signature on the

---

**6.** Under SB 1014, armed forces photo IDs, other United States-issued photo IDs, and other unspecified Missouri-issued photo IDs would also suffice to permit the voter to obtain a ballot. *Sec. 115.427.1(3) & (4)*. As those types of IDs are neither generally available to the voting public nor specifically available to the individual plaintiffs in this case, the Court's analysis will be limited to the three types of photo IDs that are generally available to all.

**7.** Simply being disabled, having a sincerely held religious belief, or being born before 1941 also is *not* enough to enable a qualified voter lacking appropriate photo ID to cast a provisional ballot. *Sec. 115.427.4*. Plaintiff Weinschenk testified below that for these reasons she could not honestly swear that *because of* one of these circumstances, she is *unable* to obtain the requisite photo ID, although to get one would be a serious burden. Swearing falsely that disability, religion or age is the reason for the lack of ID is a criminal offense. *Sec. 115.427.4* ("knowingly providing false information is a violation of law and subjects [voters] to possible criminal prosecution").

affidavit matches the signature on file with the election authority. *Id.* An election official testified below that signatures may change over time or due to disability or age. Further, the trial court found that at least one of the individual plaintiffs in this case "is unable to make a consistent signature or mark, [and] therefore, her signature will not match the signature on her voter registration record." Nonetheless, no exception to the signature match requirement is made for Missourians who are unable, because of disability or age, to make a signature or whose signature has changed due to disability or the passage of time since they made their original signature when they initially registered to vote. Thus, such persons' provisional ballots will not be counted under the statute.[8]

Plaintiffs allege that the particular Photo–ID Requirement set out in SB 1014 (unlike the anti-fraud ID provisions required under HAVA and in effect in Missouri from 2002 until SB 1014 became effective) does not pass constitutional scrutiny on a multitude of grounds.[9] The trial court agreed that Plaintiffs established the unconstitutionality of SB 1014 on three grounds relating to the burdens the law imposes on Missourians' free exercise of their right to vote as set out in the Missouri Constitution.[10]

More specifically, the trial court agreed with Plaintiffs that, while on its face the Photo–ID Requirement appears to permit Missourians without an acceptable photo ID to obtain one without cost, in reality it does not do so because the Photo–ID Re-

8. Section 115.427.12, which the dissent suggests the majority misconstrues, by its terms, only regulates the signature or mark that must be made on the precinct register when the voter appears at the polling place to vote. An additional signature or mark must be made on the provisional ballot that is cast either pursuant to section 115.427.3 or section 115.427.13. In order for the provisional ballot to be counted, it is that second signature or mark that must be verified "by comparing that individual's signature to the signature on file with the election authority." *Sec. 115.427.3; sec. 115.427.13.* The opportunity to make a mark in lieu of a signature, either on the precinct register or on the provisional ballot, makes no difference to those voters like Plaintiff Weinschenk, who uses a mark in lieu of a signature "but it's never the same." Under this statute, they are never entitled to cast a regular ballot and their provisional ballots, due to the signature match requirement, can never be counted. In light of this Court's holding on the Photo–ID Requirement, it need not separately evaluate the constitutionality of the signature match requirement. This Court is confident the legislature can find the means to address the problem this requirement presents for Missouri's disabled and aged citizens.

9. Plaintiffs argued in the trial court that SB 1014 violates the Missouri Constitution in that the Photo–ID Requirement (1) impermissibly adds additional qualification to vote in violation of *article VIII, section 2;* (2) interferes with free exercise of the right to vote in violation of *article I, section 25;* (3) violates Missouri's due process and equal protection clauses by requiring the payment of money to vote and by imposing an undue burden on the fundamental right to vote that is not narrowly tailored to meet a compelling state interest; and (4) violates the equal protection clause by having a disparate impact on registered voters in suspect classes and by improperly discriminating between in-person voters and absentee voters.

10. Plaintiffs also alleged, and the trial court found, that the cost of providing provisional ballots and other costs that municipalities were required to fund under SB 1014, imposes new mandates on local governments without appropriating state funds to cover the increased costs in violation of the *Hancock Amendment, article X, section 21.* The trial court nonetheless entered judgment on this issue in favor of Defendants because it was unclear whether it could grant statewide relief on this ground. Defendant–Appellants are, thus, not aggrieved by the trial court's dicta on this issue, and Plaintiffs have not appealed it. Therefore, this Court does not further address the Hancock issue.

quirement of SB 1014 must be read together with the requirements of the *Federal REAL ID Act of 2005, Pub.L. 109–13, Title II.* That federal act does not permit Missouri to issue "free" non-driver's licenses to its citizens unless applicants first present identification such as a United States passport or birth certificate. *Id.; see also 12 CSR 10–24.448.*

Both passports and birth certificates are themselves costly. In fact, the record reveals that Missouri charges $15 to provide the certified, embossed copy of a birth certificate required by the *Federal REAL ID Act* to obtain a non-driver's license. Missourians born in other states must pay fees ranging from $5 to $30 to obtain official copies of their birth certificates. A passport is even more expensive. The record reveals that a person born in the United States who wishes to obtain a United States passport must pay between $97 and $236, depending on the speed with which one may need the passport. For a person born outside the country, the cost of a passport may be higher due to the cost of additional documents needed as proof of citizenship or naturalization.[11]

Furthermore, the record shows that if a voter's name has changed, he or she must supply additional documentation to obtain one of the requisite photo IDs.[12] Names change for a myriad of reasons in our society: women often follow the social custom of taking their husband's name upon marriage; in the event of a divorce, women occasionally revert to using their maiden name; certain individuals choose to change their name for personal or political reasons; still others experience a name change when their parents' marital status changes subsequent to birth. All those citizens who lack a proper photo ID and whose names have changed from the time they received their birth certificate (or their passport) must obtain additional documentation of the name change (e.g., certified marriage certificate, certified divorce decree, amended birth certificate) to obtain an ID that comports with the requirements of SB 1014. This additional documentation requires the payment of further fees. For example, the cost of a certified copy of a marriage license ranges from $5 to $30.

The trial court also noted that, in addition to the monetary costs imposed on persons seeking to obtain the proper photo ID, the process to do so imposes additional practical costs, including navigating state and/or federal bureaucracies, and travel to and from the Department of Revenue and other government agencies. One of these

---

**11.** Moreover, it is difficult, though not impossible, to obtain a United States passport without a birth certificate, yet many Missourians, *particularly those born at home, do not have* birth certificates. In the absence of a birth certificate, to obtain a United States passport, voters must provide the Department of State with: (1) a "Letter of No Record" from the state of their birth indicating that the state has searched and has no record of their birth; and (2) as many public records as they can muster from the first five years of their life showing their date *and* place of birth (e.g., baptismal, hospital, school, census records); and/or (3) a notarized affidavit of birth from an older blood relative with personal knowledge of their birth.

**12.** Unlike the birth certificate and passport requirements, which would only impact those voters who do not currently have valid photo ID, the name change burdens could also affect those voters who have one of the SB 1014–approved forms of ID, but whose names have changed between the time the ID was issued and the time they register to vote. Under SB 1014, if a valid photo ID does not match a voter's registered name, the voter must obtain a new photo ID in order to vote and, therefore, undertake the additional steps necessary to provide proof of name change.

practical costs is the time it takes to receive the appropriate documentation. In Missouri, the waiting period for a birth certificate alone is six to eight weeks. In Louisiana, the birthplace of many Katrina refugees who have taken shelter in Missouri, the processing period is eight to ten weeks. Should citizens need additional documents, the bureaucratic hurdles and waiting periods would increase.

Plaintiffs claim that for many of Missouri's qualified voters, including the poor, elderly and disabled, these hurdles to obtaining the proper photo ID are not insignificant. The trial court agreed, finding these concerns real rather than speculative based on evidence pertaining to the individual plaintiffs, all of whom are qualified Missouri voters who lack an acceptable photo ID and who would struggle or be unable to obtain one.

For example, Ms. Weinschenk testified that she does not currently have a birth certificate. She was born in Arkansas, where the fee to obtain a birth certificate is $12. Ms. Weinschenk has cerebral palsy. She testified that, although obtaining a proper photo ID is a substantial burden because of her disability, she is not "unable" to do so. But, even could she truthfully swear that her disability prevented her from obtaining the proper photo ID needed to vote, because her disability prevents her from making a consistent signature mark, her signature will not match the signature on her voter registration record. Thus, any provisional ballot she casts will not be counted.

The record also contains evidence regarding the situation of other plaintiffs. Mr. William Kottmeyer has limited mobility, making it difficult for him to gather the necessary documents to obtain a non-driver's license and to stand in line at the Department of Revenue. Mr. Robert Pund has a physical condition that requires him to arrange transportation to and from the Department of Revenue and to employ an attendant to assist him in order to obtain a non-driver's license. Ms. Amanda Mullaney was born in Kentucky, and her current name does not match the name on her birth certificate because her parents were not married at the time of her birth. Thus, to obtain the proper photo ID needed to vote, she will have to provide proof of her name change by means of either a certified court order or a certified amended birth certificate. Mr. Richard von Glahn unsuccessfully attempted to obtain a non-driver's license last June and was told that, since he was not over 65–years–old, the ID would cost him $11. Additionally, Mr. von Glahn lacked a birth certificate, for which the state of his birth, Ohio, charges $20. Ms. Maudie Mae Hughes was born in Mississippi, but the state has repeatedly informed her that it does not have any record of her birth, thereby compounding her difficulties in obtaining the photo ID necessary to vote in Missouri.

The trial court found the evidence pertaining to each of these plaintiffs to be credible. It also found credible testimony from five state and local Missouri election officials regarding the nature of voter fraud currently experienced in Missouri. These government officials, all of whom have been closely involved with Missouri elections in their official capacities and have many years of experience,[13] testified

<hr/>

13. Mr. Carol Signaigo was the Assistant Director of Elections for the City of St. Louis for twelve years and, for the past seven years, has served as a consultant to the St. Louis City Election Board. Ms. Wendy Noren, now a Boone County Clerk, served for fifteen years on the legislative committee for the Association of Missouri State County Clerks and Election Authorities. Mr. Robert Nichols has been the Democratic Director of Elections for

that voter impersonation fraud is not a problem in Missouri. For instance, Ms. Betsy Byers, the Co–Director of Elections for the Secretary of State's Office for the last five years, testified that, since 2000, she has not received any reports of voter impersonation fraud from anywhere in the state. During that same period, she received reports of absentee ballot fraud, but testified that the Photo–ID Requirement does not solve such problems.[14]

Adding to the testimony of these government officials, Plaintiffs also presented exhibits indicating that voter impersonation fraud is not a problem in Missouri. In a letter to Governor Matt Blunt, Secretary of State Robin Carnahan echoed the sentiments of Ms. Byers, stating there is no evidence that voter impersonation fraud actually exists or that the Photo–ID Requirement would solve any existing problems in our elections system.

In addition, the record contains two letters written in 2004 by then-Secretary of State Matt Blunt on the subject of voter fraud. He described Missouri's statewide elections in 2002 and 2004 to then-Governor Bob Holden as "two of the cleanest and problem free elections in recent history." To the St. Louis Post–Dispatch, Blunt characterized the same elections as "fraud-free."

While Appellants offered affidavits of persons who reached conclusions contrary to some of those offered by Plaintiffs' witnesses, the trial court found Plaintiffs' evidence and witnesses to be more credible, and this Court considers the record in the light most favorable to the judgment of the trial court. *Reddish v. Heartland Auto*

*Plaza,* 197 S.W.3d 634, 636 (Mo.App. S.D. 2006).

Thus, this Court turns to the issue whether the Photo–ID Requirement of SB 1014 can withstand constitutional scrutiny despite the cost and other burdens the trial court found it placed on qualified Missouri voters. Whether a statute is unconstitutional is a question of law, the review of which is de novo. *Doe v. Phillips,* 194 S.W.3d 833, 841 (Mo. banc 2006). Because a statute is cloaked in a presumption of constitutionality, an appellate court may find the statute unconstitutional only if it clearly contravenes a specific constitutional provision. *State v. Kinder,* 89 S.W.3d 454, 459 (Mo. banc 2002). "Nonetheless, if a statute conflicts with a constitutional provision or provisions, this Court must hold the statute invalid." *Id.*

## II. EQUAL PROTECTION ANALYSIS

### A. Framework for Evaluating an Equal Protection Clause Challenge.

Both the United States and Missouri constitutions guarantee to their citizens the enjoyment of equal protection of the laws. *U.S. Const. amend. XIV, sec. 1* ("No state shall ... deny to any person within its jurisdiction the equal protection of the laws"); *Mo. Const. art. I, sec. 2* ("all persons ... are entitled to equal rights and opportunity under the law"). Courts undertake a two-part analysis to determine the constitutionality of a statute under either the state or federal equal protection clause. The first step is to determine whether the statute implicates a suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution. *Etling v.*

Jackson County Board of Election Commissioners for a little over twenty years. Ms. Judy Taylor has been the Democratic Director of Elections for St. Louis County for eight years. Ms. Betsy Byers was Deputy Secretary of State for Elections for two years and for the last five years has served as Co–Director

of Elections for the Secretary of State's Office.

14. The dissenting opinion *sua sponte* takes judicial notice of registration and census data cited in a still pending federal complaint referred to by intervenors below to argue that

*Westport Heating & Cooling Services., Inc.*, 92 S.W.3d 771, 774 (Mo. banc 2003); accord *Kadrmas v. Dickinson Public Schools*, 487 U.S. 450, 457–58, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988). "If so, the classification is subject to strict scrutiny." *Etling*, 92 S.W.3d at 774. If not, the classification will be subject to rational basis scrutiny. *Id.*

■ The second step is to apply the appropriate level of scrutiny to the challenged statute. In order to survive strict scrutiny, a limitation on a fundamental right must serve compelling state interests and must be narrowly tailored to meet those interests. *Komosa v. Komosa*, 939 S.W.2d 479, 482 (Mo.App. E.D.1997) ("Any state restriction which significantly interferes with the exercise of a fundamental right is subject to strict scrutiny and cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests."). *See also Manifold v. Blunt*, 863 F.2d 1368, 1373 (8th Cir.1988) ("The application of strict scrutiny for purposes of equal protection challenges ... involves a two-part analysis: the restriction must be necessary to serve a compelling state interest, and may not go beyond what the state's interest actually requires.").

*B. Voting is a Fundamental Right, Particularly under the Missouri Constitution.*

■ The Missouri Constitution expressly guarantees that "all elections shall be free and open; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." *Mo. Const. art. I, sec. 25.* Additionally, rather than leaving the issue of voter qualification to the legislature, the Missouri Constitution has established an exclusive list of qualifications necessary to vote in Missouri. *Mo. Const. art. VIII, sec. 2* ("All citizens of the United States ... over the age of eighteen who are residents of this state and of the political subdivision in which they offer to vote are entitled to vote at all elections by the people, if ... they are registered within the time prescribed by law"). These constitutional provisions establish with unmistakable clarity that the right to vote is fundamental to Missouri citizens.[15]

The express constitutional protection of the right to vote differentiates the Missouri constitution from its federal counterpart. Federal courts also have consistently held that the right to vote is equally fundamental under the United States Constitution. *See, e.g., Reynolds v. Sims*, 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) ("The right to vote freely for the candidate of one's choice is of the essence of a democratic society"); *Wesberry v. Sanders*, 376 U.S. 1, 17–18, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live"). But, the right to vote in state elections is conferred under federal law only by implication, not by express guarantee. *See Harper v. Virginia State Bd. Elections*, 383 U.S. 663, 665, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) ("the right to vote in state elections is nowhere expressly mentioned" in the United States Constitution).

Moreover, the qualifications for voting under the federal system are left to legislative determination, not constitutionally

---

inflated registration rolls continue to be a problem in many Missouri counties. Again, the Photo-ID Requirement addresses only voter impersonation fraud and does nothing to prevent the type of voter fraud attributable to inflated registration rolls.

**15.** *See, e.g., United C.O.D. v. State*, 150 S.W.3d 311, 313 (Mo. banc 2004); *Etling*, 92 S.W.3d at 774; *Blaske v. Smith & Entzeroth, Inc.*, 821 S.W.2d 822, 829 (Mo. banc 1991); *Mullenix-St. Charles Properties, L.P. v. City of St. Charles*, 983 S.W.2d 550, 559 (Mo.App. E.D. 1998) (all recognizing that right to vote is fundamental in Missouri).

enshrined, as they are in Missouri. *Compare U.S. Const. art. I, sec. 2* (providing that "Electors" shall be equivalent to those for state positions) *with Mo. Const. art. VIII, sec. 2* (establishing exclusive qualifications for voting in Missouri).[16] *Compare also U.S. Const. amend. XV* (protecting right to vote from abridgment "on account of race, color or previous condition of servitude") *with Mo. Const. art. I, sec. 25* (protecting right to vote from all "power, civil or military" that "interferes to prevent the free exercise of the right of suffrage").

■ Due to the more expansive and concrete protections of the right to vote under the Missouri Constitution, voting rights are an area where our state constitution provides greater protection than its federal counterpart. *See California v. Ramos*, 463 U.S. 992, 1013–14, 103 S.Ct. 3446, 77 L.Ed.2d 1171 ("It is elementary that States are free to provide greater protections ... than the [f]ederal Constitution requires."); *State v. Rushing*, 935 S.W.2d 30, 34 (Mo. banc 1996) ("Provisions of our state constitution may be construed to provide more expansive protections than comparable federal constitutional provisions."); *State ex rel. J.D.S. v. Edwards*, 574 S.W.2d 405, 409 (Mo. banc 1978) (holding that Missouri Constitution due process and equal protection clauses provide more pro-

tection than United States Constitution where United States Supreme Court precedent "dilute[s] these important rights").[17]

Of course, some regulation of the voting process is necessary to protect the right to vote itself. Such regulations are in place in all state and federal elections, and the Missouri Constitution further specifically delegates to the legislature the right to regulate registration. *Mo. Const. art. VIII, sec. 5.* In addition, many matters may tangentially affect voting, such as rules regarding who may run for office and how candidates are listed on ballots. For this reason, the extent of the burden this statute imposes on the right to vote must be evaluated before determining the level of scrutiny it will receive.

## C. SB 1014's Photo–ID Requirement Burdens Missourians' Fundamental Right to Vote.

■ The record supports the trial court's determination that SB 1014's Photo-ID Requirement places a burden on the right of Missourians to vote. As set out at length above, it requires each of the individual plaintiffs in this case to present a Missouri driver's license, a Missouri non-driver's license, or a United States passport on election day in order to vote. *Sec. 115.427.1.* The record reveals that between 3 and 4 percent of Missouri citizens

---

16. The trial court found that the Photo–ID Requirement amounted to an unconstitutional additional qualification for voting in violation of article VIII, section 2 of the Missouri Constitution. Appellants argue that it is not a qualification but necessarily agree that it is an additional showing that must be made in order to vote. Because it is not necessary to determine whether this requirement constitutes an additional "qualification," this Court does not finally resolve the issue.

17. *See also State ex rel. Amrine v. Roper*, 102 S.W.3d 541 (Mo. banc 2003) (holding that Missouri habeas corpus rights are broader

than federal habeas corpus); *State v. Whitfield*, 107 S.W.3d 253, 267 (Mo. banc 2003) (providing standard for retroactive application of constitutional decisions in Missouri that differs from federal standard); *State v. Parker*, 836 S.W.2d 930, 942 (Mo. banc 1992) (noting that the Missouri Constitution provides more specific rights to jury service than the federal constitution so the "Missouri Constitution may require greater protection of the right") (Price, J., concurring); *cf. Doe*, 194 S.W.3d at 849 (construing Missouri's constitutional proscription on retrospective laws separately where there is no federal analogue).

(estimates vary from 169,215 to 240,000 individuals) lack the requisite photo ID. Appellants concede that many of these citizens, including all of the individual plaintiffs in this case, are eligible to vote and, in many cases, are already registered to vote. Nevertheless, under the new law these eligible registered voters will not be able to cast a regular ballot (or after 2008 any ballot at all) unless they undertake to obtain one of the requisite photo IDs. This will constitute a dramatic increase in provisional ballots over the previous law, as only 8,000 provisional ballots were cast statewide in the 2004 general election.[18] As conceded by Appellants, denial of the right to vote to these Missourians is more than a *de minimis* burden on their suffrage.[19]

It is to these citizens that the Court directs its attention, as it determines whether this statute places into jeopardy their ability to exercise their fundamental right to vote under article I, section 25 of the Missouri Constitution. To do so, the Court must examine the required processes for them to obtain a photo ID to determine the extent of the burden it imposes on their right to vote.

**1. SB 1014's Photo–ID Requirement requires payment of money to exercise the right to vote.**

Those citizens who do not possess the requisite photo ID, with few exceptions, must expend money to gather the necessary documentation to obtain it in order to exercise their right to vote. Appellants argue that because the documentation-related expenses are one step removed from

obtaining the photo ID, which itself is "free," those expenses should not be considered in this Court's analysis. The fact that Missouri has waived collection of costs normally charged to persons seeking a non-driver's license does not make that license "free" if Missourians without certified copies of birth certificates or passports must still expend sums of money to obtain the license. Many voters who presently lack one of the required photo IDs would have to, at the very least, expend money to obtain a birth certificate. In Missouri, obtaining a birth certificate requires at least a $15 payment, which, Appellants conceded at oral argument, is not a *de minimis* cost. If the citizen requires documentation beyond a birth certificate, the costs are greater.

■ Although this Court has not previously had occasion to evaluate the validity of putting a direct or indirect price or fee on the franchise under the Missouri Constitution, the United States Supreme Court held, in the context of addressing a $1.50 poll tax: "Wealth or fee-paying has . . . no relation to voting qualifications; the right to vote is too precious, too fundamental to be so burdened." *Harper*, 383 U.S. at 670, 86 S.Ct. 1079. While requiring payment to obtain a birth certificate is not a poll tax, as was the $1.50 in *Harper*, it is a fee that qualified, eligible, registered voters who lack an approved photo ID are required to pay in order to exercise their right to free suffrage under the Missouri Constitution.[20] *Harper* makes clear that all fees that impose financial burdens on

18. Of these ballots, only 3,000 were counted.

19. The outcome of innumerable past races could have been affected by the votes of 3 or 4 percent of Missourians.

20. In the Indiana case upon which the State relies, the statute allowed indigent citizens

who could not obtain free proof of identity to vote. *See Ind. Democratic Party v. Rokita*, No. 05–CV–0634–SEB–VSS, 2006 WL 1005037, at *5, —— F.Supp.2d —— (S.D.Ind. Apr.14, 2006); *see also Ind.Code Sect.* 3–11.7–5–1. The Missouri statute offers no such indigency exception.

eligible citizens' right to vote, not merely poll taxes, are impermissible under federal law. There can be no lesser requirement under Missouri law.

Appellants highlight that the federal courts in Indiana and Georgia each rejected claims that photo ID requirements constitute a poll tax, *see Common Cause/Georgia v. Billups,* 439 F.Supp.2d 1294, 1355 (N.D.Ga.2006); *Ind. Democratic Party v. Rokita,* No. 05–CV–0634–SEB–VSS, 2006 WL 1005037, at *38, —— F.Supp.2d —— (S.D.Ind. Apr.14, 2006), and urge this Court to do likewise.

This case stands in stark contrast to the Georgia and Indiana cases, for their decisions were largely based on those courts' findings that the parties had simply presented theoretical arguments and had failed to offer specific evidence of voters who were required to bear these costs in order to exercise their right to vote.[21] Plaintiffs in this case, on the other hand, offered testimony of specific Missouri voters who *will* have to incur the costs associated with birth certificates and other documentation to acquire a photo ID and vote. Specifically, Plaintiff Weinschenk will have to pay $12 for her birth certificate; Plaintiff von Glahn, who was asked to pay $11 for his "free" non-driver's license required to vote under the statute, will have to pay another $20 for his birth certificate. Others, like Plaintiff Mullaney, may have to incur more substantial costs for additional documentation because their names have changed since their birth. Additionally, elections officials testified to the substantial number of other otherwise qualified Missouri voters who also must pay a fee in order to vote.

Based on this evidence, the trial court found that this cost was directly connected to Plaintiffs' exercise of the right to vote. The trial court also found that the citizens who currently lack the requisite photo ID are generally "the least equipped to bear the costs." For Missourians who live beneath the poverty line, the $15 they must pay in order to obtain their birth certificates and vote is $15 that they must subtract from their meager ability to feed, shelter, and clothe their families. The exercise of fundamental rights cannot be conditioned upon financial expense. *Cf. Griffin v. Illinois,* 351 U.S. 12, 16–19, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (holding that due process and equal protection require that indigent defendants are entitled to pursue appeals without payment of costs). In this case, Plaintiffs proved that these costs must be incurred for citizens who lack the SB 1014 mandated photo IDs to exercise their right to vote.

**2. SB 1014's Photo–ID Requirement requires time and ability to navigate bureaucracies in order to vote.**

Persons who wish to vote who do not already have the requisite photo IDs must arrange to obtain them by presenting a birth certificate or passport and, if necessary, proof of name changes. To do so requires both funds and advance planning to allow for the six to eight weeks that the record shows it takes to obtain a Missouri birth certificate (which is more time than exists between the date of this decision and the next general election). Once the birth certificate is in hand, the voter must use it to obtain one of the requisite photo IDs. "This is plainly a cumbersome proce-

---

21. See *Ind. Democratic Party,* 2006 WL 1005037, at *38, at —— (plaintiffs "provided no evidence to demonstrate that anyone will actually be required to incur this cost to vote"); *Common Cause/Georgia v. Billups,* 439 F.Supp.2d 1294, 1355 (N.D.Ga.2006) (plaintiffs "failed to show that any particular voter would actually be required to incur that cost in order to vote").

dure." *Harman v. Forssenius*, 380 U.S. 528, 541, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965) (holding that six-month advance registration to avoid poll tax unduly burdened the right to vote). Those things that require substantial planning in advance of an election to preserve the right to vote can tend to "eliminate from the franchise a substantial number of voters who did not plan so far ahead." *Id.* at 539–40, 85 S.Ct. 1177.[22]

Evaluating a similar procedure mandated by the Georgia photo ID law (which was found to violate the federal constitution), a Georgia federal district court concluded that "many voters who are elderly, disabled, or have certain physical or mental problems simply cannot navigate that process or any long waits successfully." *Common Cause/Georgia*, 439 F.Supp.2d at 1347.

As it will require payment of money and significant advance planning to obtain necessary documentation, the Photo–ID Requirement is an "onerous procedural requirement which effectively handicap[s] exercise of the franchise." *Lane v. Wilson*, 307 U.S. 268, 275, 59 S.Ct. 872, 83 L.Ed. 1281 (1939).[23] It is undisputed that

between 3 and 4 percent of the population, some 169,000 to 240,000 Missourians, and each of the individual plaintiffs here, currently do not possess the type of photo ID required by SB 1014 to obtain a regular ballot to vote. This Court agrees with the trial court that the Photo–ID Requirement of SB 1014 represents a heavy and substantial burden on Missourians' free exercise of the right of suffrage.

### D. SB 1014's Photo–ID Requirement is Subject to Strict Scrutiny.

In light of the substantial burden that the Photo–ID Requirement places upon the right to vote, the statute is subject to strict scrutiny. This is consistent with the past decisions of Missouri courts, which have uniformly applied strict scrutiny to statutes impinging upon the right to vote.[24]

 Missouri election-law cases in which strict scrutiny was not applied simply recognize, as does this Court today, that reasonable regulation of the voting process and of registration procedures is necessary to protect the right to vote.[25] So long as those regulations do not impose a heavy burden on the right to vote, they

---

**22.** Indeed, one of the motivating purposes of the Twenty-fourth Amendment to the United States Constitution (which prohibits poll taxes in federal elections) was that payment of poll taxes was often required far in advance of an election, so the lengthy advance planning resulted in an undue burden on the franchise. *Harman v. Forssenius*, 380 U.S. 528, 539–40, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965).

**23.** *Lane v. Wilson* interprets the Fifteenth Amendment to the United States Constitution, which specifically protects the right to vote from abridgement on the basis of "race, color or previous condition of servitude." Article I, section 25 of the Missouri Constitution affords greater protection to the right to vote in Missouri than the Fifteenth Amendment, so the Missouri Constitution must offer at least as

much protection to our citizens as does the Fifteenth Amendment.

**24.** *See, e.g. United C.O.D.*, 150 S.W.3d at 313; *Etling*, 92 S.W.3d at 774; *Blaske*, 821 S.W.2d at 829; *Mullenix–St. Charles Properties, L.P.*, 983 S.W.2d at 559. While none of these cases involves violations of the fundamental right to vote, each notes that voting is a fundamental right, restrictions on which must survive strict scrutiny.

**25.** *See State ex rel. McClellan v. Kirkpatrick*, 504 S.W.2d 83 (Mo. banc 1974); *Totton v. Murdock*, 482 S.W.2d 65 (Mo. banc 1972);*State ex rel. Dunn v. Coburn*, 260 Mo. 177, 168 S.W. 956 (1914); *State ex rel. Kirkpatrick v. Bd. of Election Comm'n*, 686 S.W.2d 888 (Mo.App. W.D.1985); *State ex rel. Bushmeyer v. Cahill*, 575 S.W.2d 229 (Mo.App. E.D.1978).

will be upheld provided they are rationally related to a legitimate state interest. If the regulations place a heavy burden on the right to vote, as here, our constitution requires that they be subject to strict scrutiny.

Appellants' argument that this Court should not apply strict scrutiny but should apply a "flexible" test for examining voting restrictions such as that announced by the United States Supreme Court in *Burdick v. Takushi,* 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), also is not persuasive. Here, the issue is constitutionality under Missouri's Constitution, not under the United States Constitution. Even under *Burdick's* "flexible" test, however, a court will "weigh the character and magnitude of the asserted injury to the rights protected ... against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* at 434, 112 S.Ct. 2059. When those rights are subject to "reasonable nondiscriminatory restrictions," rational basis scrutiny applies. *Id.* When those rights are subject to "severe restrictions," the Supreme Court has directed that strict scrutiny applies. *Id.* Be-

cause, here, the restrictions on the right to vote are severe, strict scrutiny would also adhere under the federal constitutional provision.

Several federal courts that have evaluated these types of burdens on the right to vote since *Burdick* are in accord that strict scrutiny must apply to direct burdens on the right to vote. See *Republican Party of Arkansas v. Faulkner County, Arkansas,* 49 F.3d 1289, 1298–99 (8th Cir.1995) (applying strict scrutiny to Arkansas requirement that political parties conduct and pay for primary elections because such provisions had the effect of forcing "many voters who wish[ed] to vote in the Republican primary to vote either in the Democratic primary or not at all," thereby burdening "the ability of persons to exercise their right to vote for the person or persons of their choice.").[26]

Applying strict scrutiny, the issues are whether the burden that SB 1014's Photo–ID Requirement places upon Missourians' fundamental right to vote serves a compelling state interest and whether it is necessary and narrowly tailored to accomplish that interest. *Komosa,* 939 S.W.2d at 482.

### E. Missouri has a Compelling Interest in Combating Election Fraud

**26.** See also *Greidinger v. Davis,* 988 F.2d 1344, 1354 (4th Cir.1993) (applying strict scrutiny to Virginia's voter registration scheme because conditioning a voter's right to vote on the public disclosure of the voter's social security number is a severe burden); *Common Cause/Georgia,* 439 F.Supp.2d at 1345–51 (applying strict scrutiny to Georgia's photo-ID requirements because the unlikelihood that many Georgia voters could obtain the appropriate ID in the short time before the next election imposed a severe burden on their right to vote); *Morgan v. City of Florissant,* 147 F.3d 772, 774 (8th Cir.1998) (whereas laws providing for the drawing of state political subdivisions warrant "review for a rational basis," laws "involving the choice of legislative representatives or impos-

ing restrictions on voters ... affect[] more significant rights and constitutional concerns, meriting strict-scrutiny review").

Similar to the Missouri cases, federal courts have applied rational basis review to election-law cases that do not directly burden the right to vote. See *Burdick,* 504 U.S. at 434–39, 112 S.Ct. 2059 (right to candidate ballot access); *ACORN v. Bysiewicz,* 413 F.Supp.2d 119, 143–49 (D.Conn.2003) (constitutionality of pre-election registration requirements); *Wexler v. Anderson,* 452 F.3d 1226, 1232 (11th Cir.2006) (constitutionality of voting machine technology); *Weber v. Shelley,* 347 F.3d 1101, 1106–07 (9th Cir.2003) (same). These cases are distinguishable because they do not involve direct and heavy burdens on the right to vote.

■ Missouri's broad interests in preserving the integrity of the election process and combating voter fraud are significant, compelling and important.

### F. SB 1014's Photo–ID Requirement is Not Necessary or Narrowly Tailored to Meeting the State's Compelling Interest in Preventing Impersonation Fraud at the Polling Place.

■ Recognizing that the State does have compelling interests in preserving electoral integrity and combating voter fraud, the issue becomes whether the record shows that the type of Photo–ID Requirement enacted in SB 1014 "is necessary to accomplish a compelling state interest." *Etling*, 92 S.W.3d at 774. Because, for the reasons set out above, this Court has found that the Photo–ID Requirement imposes a severe burden on the right to vote, it can survive strict scrutiny only by showing it is necessary to accomplish a compelling state interest or that it is "narrowly drawn to express the compelling state interest at stake." *In re Norton*, 123 S.W.3d at 173.

Yet, Appellants do not demonstrate that SB 1014's requirement of state or federally issued, non-expired photo IDs is strictly necessary or narrowly tailored to accomplish the State's asserted interests. To the contrary, Appellants concede that the only type of voter fraud that the Photo–ID Requirement prevents is in-person voter impersonation fraud at the polling place. It does not address absentee voting fraud or fraud in registration. While the Photo–ID Requirement may provide some additional protection against voter impersonation fraud, the evidence below demonstrates that the Photo–ID Requirement is

not "necessary" to accomplish this goal. As the trial court found: "No evidence was presented that voter impersonation fraud exists to any substantial degree in Missouri. In fact, the evidence that was presented indicates that voter impersonation fraud is not a problem in Missouri." [27]

The only evidence that Appellants marshal of voter impersonation fraud occurred *prior* to the enactment of identification requirements in 2002. The 2002 identification law, enacted in response to the federal HAVA law, required voters to present some proof of identity or residence when they arrived at the polling place. The list of acceptable identification under the 2002 requirements is much broader than the three types of photo ID that SB 1014 allows and included a utility bill, bank statement, expired passport, out-of-state driver's license, and other commonly available documents of identification. *Sec. 115.427, RSMo Supp.2005.*

Although Appellants protest that some of the approved identification documents under the 2002 law do not provide proof of eligibility to vote, neither does the Photo–ID Requirement. The Photo–ID Requirement assists in prevention of voter impersonation, but the evidence reveals that the 2002 requirements, which are much less restrictive on the right to vote, have been sufficient to prevent this type of fraud. These facts compel the conclusion that the Photo–ID Requirement is not "necessary to accomplish a compelling state interest."

■ The conclusion that the Photo–ID Requirement is not necessary to serve the State's asserted end should not be taken as an indication that the State's interest in

**27.** While the legislature need not address all evils at one time, *Adams Ford Belton, Inc. v. Missouri Motor Vehicle Comm'n*, 946 S.W.2d 199, 202 (Mo. banc 1997), whether a law is in fact narrowly tailored to address fraud in

voting necessarily requires this Court to look at what kinds of fraud in voting have been shown to exist and what kinds of fraud in voting the Photo–ID Requirement will ameliorate.

combating voter fraud is insubstantial. Indeed, legislative efforts to combat the types of voter fraud and opportunities for voter fraud that persist in Missouri, such as absentee ballot fraud, voter intimidation, and inflated voter registration rolls, should be encouraged. Where the legislature places a heavy burden on the right to vote, however, the Missouri Constitution requires that the burden be justified by a compelling interest and the statute be narrowly tailored or necessary to accomplish the statutory goals. The Photo–ID Requirement could only prevent a particular type of voter fraud that the record does not show is occurring in Missouri, yet it would place a heavy burden on the free exercise of the franchise for many citizens of this State.[28]

■■■ Appellants also urge that the State has a compelling interest in combating perceptions of voter fraud. While the

State does have an interest in combating those perceptions, where the fundamental rights of Missouri citizens are at stake, more than mere perception is required for their abridgement.[29] Perceptions are malleable. While it is agreed here that the State's concern about the perception of fraud is real, if this Court were to approve the placement of severe restrictions on Missourians' fundamental rights owing to the mere perception of a problem in this instance, then the tactic of shaping public misperception could be used in the future as a mechanism for further burdening the right to vote or other fundamental rights. Moreover, the public could believe that the new law has prevented fraud in Missouri elections, whereas the type of fraud that has been shown to exist—fraud in registration and in absentee ballots—is not addressed by the Photo–ID Requirement and may still need resolution. *See Jo Mannies, Suspect Voter Cards Found, St.*

28. The Court shares the dissent's concern with the persistence of fraud in voter registration and absentee balloting in Missouri. Unfortunately, the Photo–ID Requirement does nothing to ameliorate those frauds. As the dissent notes, the Baker–Carter Commission report supports the general concept of a Photo–ID Requirement and the appropriate use of signature match. This Court also does not intend to suggest that no form of signature match can be constitutional or appropriate, but rather that the form utilized here presents problems that provide further support for its determination that section 115.427 is invalid. The Court notes that, although former President Carter, co-author of the commission report, did not specifically criticize SB 1014's signature match requirement, he did state that SB 1014 does not meet commission standards.

29. Appellants cite to First Amendment cases addressing campaign finance restrictions to support their contention that the perception of fraud or corruption should be entitled to greater weight. See, e.g., *McConnell v. Federal Election Comm'n*, 540 U.S. 93, 143, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) ("the prevention of corruption or its appearance con-

stitutes a sufficiently important interest"). In the context of campaign finance reform, the appearance of corruption arises directly from the extensive financial contributions made to political candidates by those with a stake in legislative decisions. The statutes under review in campaign finance cases are all narrowly tailored to address and limit those contributions. Even though the United States Supreme Court has recognized the importance of combating the appearance of corruption, it has nonetheless invalidated many of these statutes precisely because they impose a severe and undue burden on fundamental rights under the First Amendment. See, e.g., *Randall v. Sorrell*, — U.S. —, 126 S.Ct. 2479, 2486, 165 L.Ed.2d 482 (2006) (holding that campaign finance restrictions are unconstitutional because "they impose burdens upon First Amendment interests that ... are disproportionately severe"). Unlike the campaign finance laws, the Photo–ID Requirement does not address any perception of voter fraud with precision, nor is it necessary to solve the existing voter fraud problems. On these facts, perceptions alone are insufficient *to justify* substantial burdens on fundamental rights.

*Louis Post–Dispatch*, Oct. 11, *2006, at A1.* The protection of our most precious state constitutional rights must not founder in the tumultuous tides of public misperception.

For these reasons, this Court holds that the Photo–ID Requirement violates the equal protection clause of the *Missouri Constitution, article I, section 2.*

## III. SEVERABILITY

 Recognizing that it will take time for many Missouri voters to obtain the photo ID required under SB 1014, the legislature enacted a transitional provision that allows voters who lack the requisite photo ID to cast a provisional ballot in certain elections between now and November 2008.[30] During this transitional period, an otherwise qualified voter who lacks the requisite photo ID can cast a provisional ballot after presenting one of the many forms of identification that could be presented under the previous version of section 115.427. *Sec. 115.427.13.* As with the provisional ballots cast under the exception to the Photo–ID Requirement discussed in Section I above, for a transitional-period provisional ballot to be counted, the signature on the affidavit must match the signature on file with the election authority, however long ago the signature on file was made and without regard to any disability or infirmity of the voter. *Id.*

This Court rejects Appellants' argument that, even if constitutional infirmities exist as to the permanent provisions of the Photo–ID Requirement, the transitional provisions are severable from the permanent provisions and could go into effect despite the invalidity of the permanent provisions.

 While there is a presumption that "[t]he provisions of every statute are severable," Sec. 1.140, RSMo 2000, if any provision of a statute is found unconstitutional, the remaining provisions cannot stand if they are "so essentially and inseparably connected with, and so dependent upon, the void provision that it cannot be presumed the legislature would have enacted the valid provisions without the void one." *Id.* In other words, "[t]he test of the right to uphold a law, some portions of which may be invalid, is whether or not in so doing, after separating that which is invalid, a law in all respects complete and susceptible of constitutional enforcement is left, *which the Legislature would have enacted if it had known that the exscinded portions were invalid." State ex rel. Audrain County v. Hackmann*, 275 Mo. 534, 205 S.W. 12, 14 (banc 1918) (emphasis added); accord *City of Springfield v. Sprint Spectrum, L.P.*, 203 S.W.3d 177, (Mo. banc 2006), 2006 WL 2257073, *8.

The transitional provision of SB 1014's Photo–ID Requirement is just that: transitional. After November 2008, Missouri voters who lack the requisite photo ID will no longer be able to vote, by provisional ballot or otherwise unless they fall within the limited class of voters allowed to cast a provisional ballot under section 115.427.3's exception to the Photo–ID Requirement discussed in Section I above. Nothing in SB 1014 suggests that the legislature would have enacted the transitional provisions without the permanent provisions. The transitional provisions are enacted as part of the same section, 115.427, as the permanent provisions and provide only a temporary exception to the otherwise valid and currently enforceable Photo–ID Re-

---

**30.** The permanent provisions of SB 1014's Photo–ID Requirement have been in full effect since the enactment of SB 1014. The transitional provision merely provides an al-

ternative method of voting (by provisional ballot instead of regular ballot) for persons who lack the appropriate photo-ID during the transitional period.

quirement. Nothing in this section suggests that the legislature would have enacted *only* this transitional provision if it believed the law would simply revert to the previous statute after the transition ended in November 2008. A transition is inherently a step towards an end, not an end in itself.

Since the transitional provisions are "so essentially and inseparably connected with, and so dependent upon" the permanent provisions, *Sec. 1.140, RSMo 2000*, these transitional provisions cannot be severed. While the legislature may remedy the constitutional problems that assail SB 1014's Photo–ID Requirement, the Court cannot speculate as to the terms of some new statute as yet not enacted.

Partly in response to Appellants' contention that the interim provisions of section 115.427 are severable from the remainder of that section, Plaintiffs make the additional argument that SB 1014 allows provisional voting (both the type allowed under the transitional provisions and the type allowed under section 115.427.3's exception to the Photo–ID Requirement discussed above) *only* at federal elections and in primaries. If this is the case, it would present an additional and serious constitutional problem.

When provisional balloting was first instituted in Missouri in 2002, it was permitted only for primary and general elections in which candidates for federal or statewide offices were nominated or elected and for any election in which statewide issues were submitted to the voters. *See sec. 115.430.1, RSMo Supp.2005*. The procedures for counting such ballots were set out in section 115.430. *Id.*

The provisional voting permissible under SB 1014's Photo–ID Requirement states that such provisional ballots "shall be entitled to be counted, provided the election authority verifies the identity of the indi-

vidual by comparing that individual's signature to the signature on file with the election authority and determines that the individual was otherwise eligible to cast a ballot at the polling place where the ballot was cast." *Sec. 115.427.13; accord Sec. 115.427.3*. The only statutory method of determining eligibility of those who cast such provisional ballots is pursuant to section 115.430. But, whether intentionally or through oversight, the legislature chose not to amend or delete subsection 115.430.1, which still provides that determining eligibility and counting provisional ballots may be made under that section only in primaries and statewide or federal elections.

The result is that either there is no provisional voting in local elections when the two provisions are read *in pari materia* or else there is provisional balloting in such elections, but the statutes provide no means of determining the eligibility of those provisional voters and no safeguards for collecting and counting those votes, which would itself present serious constitutional problems. The dissent suggests a third approach: that the "internal inconsistency" in section 115.430 should be harmonized by reading the reference to section 115.427 in 115.430.2 to expand the scope of 115.430 to encompass "any election." This interpretation would read section 115.430.1 out of the statute completely, which this Court is not permitted to do. *Kearney Special Road Dist. v. County of Clay*, 863 S.W.2d 841, 842 (Mo. banc 1993) ("Where language of a statute is clear, courts must give effect to the language as written. Courts are without authority to read into a statute a legislative intent contrary to the intent made evident by the plain language.") (citations omitted). In any event, since section 115.427 is stricken on other grounds, this Court need not conclusively resolve the issue regarding

how to interpret these incongruous provisions and leaves it to the legislature to clarify them.

Thus, without deciding the issue of whether the interim provisional ballots (or those provisional ballots available under section 115.427.3's exception to the Photo–ID Requirement) are available only for federal or statewide elections and primaries, the Court holds that the transitional provisions of section 115.427.13 must be struck down together with the permanent provisions of SB 1014's Photo–ID Requirement because the former is not severable from the latter.

## IV. RIPENESS

The dissent characterizes this Court's holding that the statute's Photo–ID Requirement, which currently governs all elections in Missouri, is unconstitutional as "a straightforward violation of the ripeness doctrine." Not so. First, the dissent's analysis depends upon the severability of the transitional provisions. As this Court determines that the transitional provisions are not severable from the permanent provisions, it need not (and does not) reach the question of the constitutionality of the transitional provisions.

 Second, even were the transitional provisions severable, an evaluation of the constitutionality of the permanent provisions would be ripe. To be ripe for judicial determination, a controversy must be "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Missouri Health Care Ass'n v. Attorney General of State*, 953 S.W.2d 617, 620 (Mo. banc 1997). "[C]onstitutional challenges to laws [are] ripe when the facts necessary to adjudicate the underlying claims were fully developed and the laws at issue were affecting the plaintiffs in a manner that gave rise to an immediate, concrete dispute." *Id.* The Photo–ID Requirement unmistakably meets this standard.

 If the Photo–ID Requirement is valid and enforceable, Missouri voters must take action and incur costs now, or at least before the transitional period ends in November 2008, in order to secure their ability to vote in the future. The transitional provisions central to the dissent merely provide a temporary alternative to the costly and burdensome procedure required under the permanent provisions to obtain an approved photo ID. Consequently, the dispute regarding the constitutionality of the Photo–ID Requirement is immediate and concrete.

Furthermore, the types of photo ID one must obtain, the procedures one must follow to obtain them, and the cost of any required supporting documentation were proved with sufficient certainty to the trial court. The only "fact" that the dissent posits is not fully developed is whether the legislature will take any future action that could possibly bring the statute into compliance with Missouri's constitutional commands. This is no fact at all, and certainly no barrier to this Court's determination of the constitutionality of this statute, which is presently in effect. While this Court shares the hope that the legislature will be able to rectify the problems identified here and pass a constitutional law that is less burdensome on the right to vote, the version of section 115.427 now in effect is the only one ripe for judicial consideration.

## V. CONCLUSION

The Missouri Constitution provides a specific provision that enshrines the right to vote among certain enumerated constitutional rights of its citizens. *Mo. Const. art. I, sec. 25.* SB 1014's Photo–ID Requirement creates a heavy burden on the right to vote and is not narrowly tailored

to meet a compelling state interest, so it falls afoul of the Missouri Constitution's equal protection clause, *Mo. Const. art I., sec. 2,* and of Missourians' specific constitutional protection of the right to vote. Mo. Const. art. I, sec. 25. For these reasons, the trial court judgment is affirmed.

WOLFF, C.J., STITH, TEITELMAN and WHITE, JJ., and BLACKMAR, Sr. J., and RAHMEYER, Sp. J., concur.

LIMBAUGH, J., dissents in separate opinion filed.

PRICE and RUSSELL, JJ., not participating.

STEPHEN N. LIMBAUGH, JR., Judge, dissenting.

I respectfully dissent.

Whatever the deficiencies in the Missouri Voter Protection Act (MVPA), whether real or imagined, the allowance for provisional voting cures all, at least during the two-year transition period before the general election in 2008. Until that time, every person who is properly registered to vote will be allowed to do so, even without a valid photographic identification (photo ID), and indeed, every person who would have been allowed to vote before the enactment of the MVPA will be allowed to do so just as before. Those persons who have no photo ID can cast a provisional ballot using the same, simple means of identification that have been required since 2002, and all provisional ballots properly cast will be counted. In addition, a determination of the constitutionality of the photo ID provisions of the Act as it applies after the two-year transition period is not yet ripe for adjudication, because it may well be that the General Assembly, in the interim, will act to alleviate the perceived deficiencies.

I.

As the majority notes, provisional balloting statutes were first enacted by the General Assembly in 2002 in response to the mandate of the federal "Help America Vote Act," (HAVA), 42 U.S.C. sec. 15482. HAVA requires that states provide a "fail-safe" procedure for voting so that a person whose registration or identity is challenged can cast a provisional vote that will be counted if it is later determined that the person was indeed entitled to vote. In pertinent part, HAVA states:

(2) The individual shall be permitted to cast a provisional ballot at that polling place upon the execution of a written affirmation by the individual before an election official at the polling place stating that the individual is:

(A) a registered voter in the jurisdiction in which the individual desires to vote; and

(B) eligible to vote in that election.

(3) An election official at the polling place shall transmit the ballot cast by the individual or the voter information contained in the written affirmation executed by the individual under paragraph (2) to an appropriate State or local election official for prompt verification under paragraph (4).

(4) If the appropriate State or local election official to whom the ballot or voter information is transmitted under paragraph (3) determines that the individual is eligible under State law to vote, the individual's provisional ballot shall be counted as a vote in that election in accordance with State law.

Missouri's provisional voting statutes are in full accord with HAVA. In particular, section 115.427.13, RSMo Supp.2006, the provisional voting statute that applies to persons who do not present a valid photo

ID when voting in elections during the two-year transition period, states:

13. For any election held on or before November 1, 2008, an individual who appears at a polling place without identification in the form described in subsection 1 of this section, and who is otherwise qualified to vote at that polling place, may cast a provisional ballot after:

(1) Executing an affidavit which is also signed by two supervising election judges, one from each major political party, who attest that they have personal knowledge of the identity of the voter, provided that the two supervising election judges who sign an affidavit under this subdivision shall not be involved or participate in the verification of the voter's eligibility by the election authority after the provisional ballot is cast; or

(2) (a) Executing an affidavit affirming his or her identity; and

(b) Presenting a form of identification from the following list:

a. Identification issued by the state of Missouri, an agency of the state, or a local election authority of the state;

b. Identification issued by the United States government or agency thereof;

c. Identification issued by an institution of higher education, including a university, college, vocational and technical school, located within the state of Missouri;

d. A copy of a current utility bill, bank statement, government check, paycheck, or other government document that contains the name and address of the voter; or

e. Driver's license or state identification card issued by another state.

Such provisional ballot shall be entitled to be counted, provided the election authority verifies the identity of the individual by comparing that individual's signature to the current signature on file with the election authority and determines that the individual was otherwise eligible to cast a ballot at the polling place where the ballot was cast.

Under the voting laws in effect before the enactment of the MVPA, all regular voters were required to present one of several approved forms of identification, which included certain non-photo IDs. Sec. 115.427.1, RSMo Supp.2002.[1] Now, under the transitional provisional voting sections of the MVPA, individuals may still vote by presenting the same forms of non-photo ID that were permitted before the enactment of MVPA—even "a copy of a current utility bill, bank statement, government check...." Sec. 115.427.13. The only difference is that voters who present a form of identification other than an approved photo ID must also sign a simple two-sentence form affidavit available at the polling place swearing to the fact that they are who they say they are. Sec. 115.427.14, RSMo Supp.2006. Then, once the affidavit signature is verified "by comparing that individual's signature to the current signature on file with the election authority," the provisional ballot "shall be counted." This provisional voting procedure of "written affirmation" and "prompt verification" of that affirmation—mandated by HAVA—is no real burden on an individual's right to vote.

### A.

Although the majority makes clear that it is not holding the provisional voting sections unconstitutional, it suggests, none-

---

1. In the alternative, if the voters were known to the supervising election judges, they need not have presented an ID but were required to swear out an affidavit attested to by those election judges. Sec. 115.427.1, RSMo Supp. 2002.

theless, that the provisional voting procedures may present a constitutional issue. The stated concern is that "no exception to the signature match requirement is made for Missourians who are unable, because of disability or age, to make a signature or whose signature has changed due to age or the passage of time since they made their original signature when they initially registered to vote."

Tellingly, the majority cites no authority whatsoever that a signature match requirement is a constitutionally impermissible means to verify a voter's identity. After all, the signature match requirement was taken directly from the report of the Commission of Federal Election Reform co-chaired by former President Jimmy Carter and former Secretary of State James A. Baker, Jr. In particular, section 2.5.3 of that report states:

> We recommend that until January 1, 2010, states allow voters without a valid photo ID card (Real or EAC-template ID) to vote, using a provisional ballot by signing an affidavit under penalty of perjury. The signature would then be matched with the digital image of the voter's signature on file in the voter registration database, and if the match is positive, the provisional ballot should be counted. . . .

Except for providing a digital image of the voter's signature from the voter registration database, the MVPA signature match provisions are exactly the same.

The majority appears particularly troubled by allegations that voters who cannot make a signature will be disenfranchised.

However, section 115.427.12, which the majority disavows, adequately addresses that concern. That section provides:

> If any voter is unable to sign his name at the appropriate place on the certificate or computer printout, an election judge shall print the name and address of the voter in the appropriate place on the precinct register, the voter shall make his mark in lieu of signature, and the voter's mark shall be witnessed by the signature of an election judge.

Section 115.427.12 allows voters to sign by mark on the voter's identification certificate in section 115.427.9, which is the sworn oath confirming the voter's identity and registration that all voters must sign before receiving a regular ballot. The "mark" provision of section 115.427.12 necessarily applies as well to the provisional voter affidavit because that affidavit is used in lieu of the voter's identification certificate for those voters casting a provisional ballot under section 115.427.13.[2] There are at least three rules of statutory construction that compel this conclusion. First, because these sections relate to the same subject matter, they must be read *in pari materia*, that is, they must be interpreted harmoniously and consistently with each other. *Baldwin v. Director of Revenue*, 38 S.W.3d 401, 403 (Mo. banc 2001). Second, these sections must be construed liberally in support of the fundamental right to vote. *State ex rel. School Dist. of City of Jefferson, Cole County v. Holman*, 349 S.W.2d 945, 947 (Mo. banc 1961). And third, these sections must be construed "in

---

**2.** The majority's assertion in footnote 8 that the signature to be made on the provisional ballot is "an additional signature" to that which "must be made on the precinct register" appears to be incorrect. Persons who appear at a polling place and who do not have an approved identification need not sign the oath on the "Voter's Identification Certifi-

cate," but proceed directly to provisional voting by executing an affidavit affirming his or her identity stating, "I do solemnly swear (or affirm) that my name is _____; that I reside at _____; and that I am the person listed in the precinct register under this name and at this address." Sec. 115.427.13, 14.

light of a strong presumption of a statute's validity," and this Court will "make every reasonable intendment" to that end. *Reproductive Health Services v. Nixon*, 185 S.W.3d 685, 688 (Mo. banc 2006). When sections 115.427.12 and 115.427.13 are construed in these ways, all voters who cannot make a signature, whether regular or provisional, may make their mark with the assistance of an election judge.

Regardless, the majority still complains that the provisional ballots of voters who sign their ballot affidavits by mark will not be counted because there can be no signature match of a mark. Again, the majority seems unwilling to read these inter-connected voting statutes *in pari materia* and to construe them liberally in support of the fundamental right to vote and in view of the presumption of constitutionality. In my mind, just as signing by mark is an exception to the signature requirement to prove one's identity for registering (sec. 115.161) and for voting (sec.115.427.12), so too it is implicitly an exception to the signature match requirement to prove one's identity for provisional voting. Having allowed voters who cannot make a signature to sign by mark, the General Assembly surely cannot have intended that those persons are nonetheless subject to a signature match. Indeed, to submit voters who sign by mark to a signature match would be an absurd construction of the statute and would lead to the absurd conclusion that their provisional ballots would not be counted. That result, however, would not obtain under the above rules of construction, not to mention the corollary rule of construction that it is presumed "that the legislature did not intend to enact an absurd law." *Care and Treatment of Schottel v. State*, 159 S.W.3d 836, 842 (Mo. banc 2005). In these instances I would hold that the identity of a voter who cannot sign by signature is established simply by the mark, the witness thereto,

and the presentation of an otherwise approved non-photo ID.

B.

The majority also suggests that provisional voting requirements will not apply in municipal and local elections (as opposed to primary and general elections) because "[t]he only method of determining eligibility of those who cast such provisional ballots is pursuant to section 115.430," which by its terms, "shall apply to primary and general elections...." However, section 115.427.13 expressly states that an individual appearing without a photo ID may cast a provisional ballot in "*any* election held on or before November 1, 2008 ...." (emphasis added). That said, section 115.430 is internally inconsistent. On one hand, it states that its provisions "shall apply to primary and general elections," and, on the other hand, it states that "a voter ... shall be entitled to vote a provisional ballot ... upon executing an affidavit under section 115.427," which, as noted, allows provisional voting in *any* election. However, reading these sections *in pari materia*, the discrepancy may properly be resolved and the statutes harmonized by reference to the fact that section 115.430 was later amended, as part of the MVPA, to relate back to section 115.427, thus expanding the scope of section 115.430 to encompass "any election." Alternatively, the doctrine of repeal by implication controls. This Court has consistently held that when two statutory provisions are repugnant, "the later act ... operates to the extent of the repugnancy to repeal the first." *Morrow v. City of Kansas City*, 788 S.W.2d 278, 281 (Mo. banc 1990). The doctrine has classic application to this case: Because section 115.430 was amended to incorporate section 115.427 and that section's application to "any election," the amendment to section 115.430 served to

repeal by implication section 115.430's limitation to primary and general elections.

## C.

Ultimately, the majority disallows the two-year transition provisions not because of the signature match issue or the local and municipal election issue, but instead because the two-year transition provisions are not severable from the permanent provisions that become effective for the November 2008 elections. The controlling authority, section 1.140, RSMo, states as follows:

> The provisions of every statute are severable. If any provision of a statute is found by a court of competent jurisdiction to be unconstitutional, the remaining provisions of the statute are valid unless the court finds the valid provisions of the statute are so essentially and inseparably connected with, and so dependent upon, the void provision that it cannot be presumed the legislature would have enacted the valid provisions without the void one; or unless the court finds that the valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

As interpreted by this Court, section 1.140 means that all "statutes are presumptively severable." *General Motors Corp. v. Director of Revenue*, 981 S.W.2d 561, 568 (Mo. banc 1998).

The majority holds that because the permanent photo ID sections in SB 1014 fail, the two-year transitional provisions must fail as well, as those provisions are "so essentially and inseparably connected with and so dependent upon" the permanent sections. There is no claim, however, that "the valid provisions [the two-year transitional sections] standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent,"

and clearly those sections can in fact stand alone and are in fact complete and capable of being executed in accordance with the legislative intent. Instead, the majority claims that "[n]othing in SB 1014 suggests that the legislature would have enacted the transitional provisions without the permanent provisions."

To the contrary, had the General Assembly truly intended the transitional provisions set out in section 115.427.13 to be nonseverable, it would have said so expressly, just as it did in section 115.427.11, a companion section enacted as part of the very same bill, SB 1014. Section 115.427.11, which pertains to the secretary of state's authority to promulgate administrative rules "to effectuate the provisions of this section [115.427.10]" states:

> Any rule or portion of a rule, as that term is defined in section 536.010, RSMo, that is created under the authority delegated in this section shall become effective only if it complies with and is subject to all of the provisions of chapter 536, RSMo [the Administrative Procedure Act as it relates to the procedures for promulgating administrative rules], and, if applicable, section 536.028, RSMo. This section and chapter 536, RSMo, are NONSEVERABLE . . . . (emphasis added).

The clear implication of the General Assembly's express nonseverability declaration is that the other sections, including section 115.427.13, none of which contain such a declaration, remain severable in accordance with the statutory presumption in section 1.140.

Even without that clear implication, there is ample good reason to abide by the statutory presumption. In all likelihood, the General Assembly would have intended for the transitional provisions to be in effect for only two years despite the invalidity of the permanent provisions, because at

least the voting public would have had the benefit of the photo ID requirement during that time, albeit in a more restricted format. In addition, the transitional provisions, with their allowance for extensive provisional voting, have the apparent purpose to "buy time" for the General Assembly to correct any constitutional infirmities in the permanent provisions of the statute that the courts might discover during the two-year interim period. That contingency, of course, has been borne out in this very case. The majority's reasoning in this regard, however—that "The transitional provision[s . . . are] just that: transitional"—is altogether empty, as it would assign no purpose at all to the transitional provisions. And if the majority is thus unable to identify a purpose to the transitional provisions that would justify overcoming the presumption of severability, then how can it be fairly said that the presumption has been overcome?

In the final analysis, perhaps the best recitation of the notion of severability, and the most accurate capsulization of the words of section 1.140, is found in the jurisprudence of the United States Supreme Court, stated most recently in *Ayotte v. Planned Parenthood of Northern New England,* —— U.S. ——, 126 S.Ct. 961, 968, 163 L.Ed.2d 812 (2006): "After finding an application or portion of a statute unconstitutional, we must next ask: Would the legislature have preferred what is left of its statute to no statute at all?" In this case, I have no doubt that the legislature's answer would be a resounding yes.

### D.

In sum, I would hold that provisional voting during the transitional two-year period is not constitutionally infirm, that the allowance for provisional voting during that period precludes any legitimate claim of voter disenfranchisement, and that the transitional provisions are severable.

### II.

Because the permanent provisions of the MVPA do not take effect until the general election in November of 2008, any decision on the constitutionality of that part of the Act is premature. Relief granted by way of a declaratory judgment is not available "to adjudicate hypothetical or speculative situations which may never come to pass." *State ex rel. Nixon v. American Tobacco Co., Inc.,* 34 S.W.3d 122, 128 (Mo. banc 2000), citing *Farm Bureau Town & Country Ins. Co. v. Angoff,* 909 S.W.2d 348, 352 (Mo. banc 1995). Said another way, a declaratory judgment requires a justiciable controversy, which means, in part, that the controversy is ripe for judicial determination. *Missouri Health Care Ass'n v. Attorney General of the State of Mo.,* 953 S.W.2d 617, 620 (Mo. banc 1997). To be ripe, a controversy must be "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* at 621. Moreover, a controversy is only ripe "if the parties' dispute is developed sufficiently to allow the court to make an accurate determination of the facts, to resolve a conflict that is presently existing, and to grant specific relief of a conclusive character." *Id.*

Although the majority claims that "Missourians must take action and incur costs now," it then concedes that the real deadline is a full two years from now. And although the majority is correct that the statute is presently in effect, two years will pass before the parts of the statute the majority finds unconstitutional will be implemented. Until that time, no harm, real or imagined, will come to any voter. In the meantime, however, the evidence on which the trial court based its findings and judgment is subject to significant change. For instance, plaintiffs' primary griev-

ance—that the cost of securing birth certificates or other forms of suitable identification in order to obtain a "free" photo ID is an undue burden on the right to vote—may well be satisfactorily addressed by the General Assembly during its upcoming sessions. If so, the trial court and this Court would be hard pressed to maintain that the statute is unconstitutional. Given the two-year transition period, there is no immediacy to the controversy, no possibility for an accurate determination of the facts, and no way to grant relief specific to the alleged harm. To declare the statute unconstitutional under these circumstances is a straightforward violation of the ripeness doctrine.

## III.

Although I would not reach the merits of the claim against the permanent provisions of the MVPA due to lack of ripeness, I cannot leave unchallenged the majority's incomplete recitation of the facts pertaining to the existence of voter fraud and the need for a photo ID system to combat that fraud. According to the majority, there has been no fraud in the polling places; thus no need to prevent it. But the evidence, in part, is this: In an investigative report issued after the 2000 presidential election by outgoing Secretary of State Rebecca McDowell Cook, and introduced in evidence in this case, "135 people who were not registered to vote were permitted to vote at a polling place without a court order and without apparent authorization from [an election] Board Official." A subsequent report from then Secretary of State Matt Blunt noted, as even the plaintiffs have acknowledged here, that 79 voters registered from vacant lots, 45 people voted twice, and 14 votes were cast by the "dead." Further, as set out in a pending complaint filed in federal court by the United States Department of Justice against the State of Missouri and cited to the trial court and this Court without objection, there is a stunningly large number of duplicate and ineligible voter registrations throughout the state. According to that portion of the complaint, which is based on government records that are subject to judicial notice,

[A] comparison of State voter registration data posted on the website of the Missouri Secretary of State with data from the United States Census Bureau indicates that at least 34 (nearly one-third) of the election jurisdictions in Missouri had more registered voters in November 2004 than there were persons of voting age in those jurisdictions under July 2003 Census estimates (released September 2004), and that 29 election jurisdictions in the State had more registered voters in November 2004 than there were persons of voting age in those jurisdictions under July 2004 Census estimates (released August 2005). Indeed, the State's data indicates that the local election jurisdiction with the highest ratio, Reynolds County, had 153% of its 2003 Census voting age population, and 151% of its 2004 Census voting age population, registered to vote in the November 2004 federal election. This State's data further indicates that, statewide, Missouri had voter registration totals in November 2004 amounting to 98 percent of the state's voting age population according to July 2003 Census estimates and 96 percent of the state's voting age population according to July 2004 Census estimates.

Although the majority agrees that there is some evidence of voter fraud at the voter registration stage, they discount that evidence as if it had no connection with fraud at the polling place. But why else does voter registration fraud occur if not to vote persons fraudulently registered? And if, as in the DOJ report, there are more voters registered to vote than persons eligible to vote, the requirement to present a photo ID will at least eliminate those who

attempt to vote in the place of others and those who attempt to vote more than once. It must be said, too, that even if there were no substantial evidence of existing voter impersonation fraud, legislatures are permitted to respond to the potential for such fraud, and they may do so "with foresight" rather than "reactively." *Munro v. Socialist Workers Party*, 479 U.S. 189, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986). In any event, as the Carter–Baker Commission recently concluded, "there is no doubt that [in-person voter fraud] occurs" and that such fraud "could offset the outcome of close elections."

## IV.

For the foregoing reasons, I would reverse the judgment of the trial court.[3]

---

**3.** Like the majority, I would not address plaintiff's Hancock claims at this time because, although the trial court made certain findings in favor of plaintiffs, it entered judgment in favor of defendants and plaintiffs did not file a cross-appeal.